Geoffrey J. Spreter (SBN 257707)
SPRETER LAW FIRM, APC
402 W. Broadway, Suite 860
San Diego, CA 92101
Telephone: (619) 865-7986
Fax: (619)-956-3932
geoff@spreterlaw.com

*Attorneys for Plaintiff and the
Proposed Class*

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Dennis Gray, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>v.<br><br>TALK FUSION, INC., a Florida Corporation, TALK FUSION INTERNATIONAL, INC., a Florida Corporation, MANE WORLD PRODUCTIONS, INC., an Oregon Corporation, and ROBERT REINA, a resident of Florida.<br><br>     Defendants | Case No. **'15CV2665 LAB JLB**<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>**CLASS ACTION** |

1

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION……………………………………..………..2

II.     PARTIES ……………..…………………………………..……..12

    A.    The Plaintiff …………………………………………………..12

    B.    The Defendants …………………………………………………12

III.    CONSPIRACY, AGENCY, JOINT VENTURE, ALTER EGO………..17

IV.     JURISDICTION AND VENUE……………………………………...18

    A.    The Nature of Pyramid Schemes ……………………………......19

    B.    The Talk Fusion Pyramid's Basic Structure………………….............25

    C.    Defendants' Enterprise Constitutes a Pyramid Scheme ……..……...31

        1.    Recruiting presentations by the Defendants and others at
the top of the Talk Fusion Pyramid emphasize recruitment of new
Associates over the sale of products and services to customers outside
of Talk Fusion   …..……….…………….……………………………..3

        2.    Official Talk Fusion training materials emphasize
recruitment of new members over the sale of products and
services to actual end users outside of Talk Fusion
…………………..……………..……………………………..…..43

        3.    Talk Fusion's products are only purchased by Associates
to gain eligibility for commissions  ……...…………………………54

        4.    Commissions are ostensibly earned on sales of products
and services are, in fact, tied to recruitment of new Associates…….67

        5.    Bonuses are ostensibly earned on sales of products and
services are, in fact, tied to recruitment of new Associates…………67

6.    In furtherance of the illegal pyramid scheme, Talk Fusion makes false claims about its legitimacy and success…………………….…………….......................7

7.    The arbitration agreement is procedurally and substantively unconscionable and unenforceable……….....................73

8.    Under the factors considered in Ninth Circuit in BurnLounge Talk Fusion is a pyramid scheme…………………….84

V.    PLAINTIFFS' CLASS ACTION ALLEGATIONS……………….…..87

VI.    CLAIMS FOR RELIEF………………………………………...90

A. Count I -Judgment Declaring Talk Fusion's Arbitration and Forum Selection Provisions Unconscionable and Unenforceable……………………………………………….91

B. Count II - Racketeering Activity in Violation Of 18 U.S.C. 1962(c) (Versus All Defendants) …………………………………...……...93

C. Count III - Racketeering Activity in Violation Of 18 U.S.C.962(a)(Versus All Defendants) ……………………….…......98

D. Count IV -Conspiracy to Commit Racketeering Activity In Violation Of 18 U.S.C. & 1962(d) (Against All Defendants)…………………………….………………….…...99

E. Count V - Injunctive Relief Under 18 U.S.C. & 1964(a)(Against All Defendants) …………………………..…………………….......................100

F. Count VI - Unlawful, Unfair and Fraudulent Business Practices Under The California Business and Professions Code § 17200, et seq. (Against All Defendants……………………………………………101

G. Count VII - California Business and Professions Code § 17500, et seq.(Against All Defendants)………………………………………103

VII. PRAYER FOR RELIEF……………………………………..……………104

VIII. DEMAND FOR A JURY TRIAL………………………………………...106

# I.      INTRODUCTION

1. Talk Fusion is a pyramid scheme disguised as a multi-level marketing ("MLM") company offering supposedly "revolutionary" and "patent-pending" video-conferencing technology. In marketing materials, prospective recruits are told to imagine being involved at the beginning of "Apple, Facebook, Twitter, or Microsoft."[1][2] (Exs. 1, 2) They are told that Talk Fusion has "exclusive rights" to a "new and revolutionary" technology. In addition, they are informed that Talk Fusion is paying people around the world to market this supposed "new and revolutionary" ability to video conference across different platforms (such as Windows and Android operating systems). Talk Fusion further states to prospective recruits, that this is their chance to get in at the beginning of a "billion-dollar" company.

2. Participants in this alleged MLM ("Associates") pay Talk Fusion a $39.00 signup fee, and are **required** to purchase product packages ranging from $250 to $1,499 (as well as pay a monthly storage fee that ranges from $35 to $215 a month), for the right to participate in the "Talk Fusion Opportunity." (See Exs. 2, 22). The Talk Fusion "business opportunity" entitles the Associate to receive bonuses and commissions for recruiting new Associates and selling Talk Fusion products and

---

[1] http://1864570.jointalkfusion.com/default.asp
[2] https://www.youtube.com/watch?v=zspMq8sAnEc

services. Potential prospects are told they will be selling a "revolutionary technology" that provides them a lifetime residual income: "Money coming in week after week, month after month, for years to come. ***True residual income that I like to call the sitting-on the-beach-money.*** Because it could be going into your cash-card account even when your sun-bathing on the beach."[3]

3.  The majority of Talk Fusion's products are individually available for free (or at much lower monthly rates than Talk Fusion) on the Internet, through commonplace programs such as Skype, YouTube, and Google. Additionally, nationally-recognized, long-standing brands such as Adobe, Webex, Centrix, and Cisco offer a product similar to Talk Fusion's--without the $250, $750, and $1,450 signup fees. Talk Fusion is able to sell its "business opportunity" by misleading prospective Associates into believing they are getting in on the beginning of the "biggest invention in the history of the internet:" videoconferencing.[4] They are reminded that "incredible opportunities like this only come once in a lifetime."[5] "Timing is everything."[6] According to recruitment videos, the world was disconnected before the existence of Talk Fusion Connect. "If you had Skype you

---

[3] https://www.youtube.com/watch?v=bPONZGj4cl0
[4] https://www.youtube.com/watch?v=zspMq8sAnEc
[5] Id.
[6] Id.

had to talk to Skype users, if you had iPhone and wanted to FaceTime, you had to have Apple iPhone with FaceTime. The world was disconnected. Until now. Talk Fusion Connect allows people to communicate directly with anyone and on any device with no 3rd party software."[7] According to the announcer, "this is exciting, but you have to have the right financial horsepower behind you, and have the right company to be successful in marketing a new technology," like the one Talk Fusion possesses.[8]

4.   Recruits are told that Talk Fusion is in the process of building a "billion-dollar brand" like Skype, Cisco, YouTube, Facebook, or Netflix, and that "Now Is the Time to Be Part of the Next Big Thing." (Ex. 1) According to Talk Fusion's promotional videos, Talk Fusion: has been around since 2007; has a proven track record of success ("within three years at our current growth rate, we'll be a billion dollars a year in revenue)[9]; is the "number-one fastest growing home-based business in the world ("there's only one number one—and that's us.")[10]; and is a prestigious member of the Direct Sellers Association ("the crème of the crop, you have to be selected"), with an A+ rating by the BBB.[11] Its founder and CEO, Robert Reina, is

---

[7] http://1864570.jointalkfusion.com/default.asp
[8] https://www.youtube.com/watch?v=etPVRFRhRgE
[9] https://www.youtube.com/watch?v=hVQ7qpjYnFY
[10] https://www.youtube.com/watch?v=hVQ7qpjYnFY
[11] https://www.youtube.com/watch?v=etPVRFRhRgE

an ex-police officer with over 20 years of experience in relationship marketing as a multiple seven-figure earner with multiple companies.[12] Beyond selling video-email and videoconferencing, Talk Fusion sells Associates "a dream" of financial prosperity.[13] (Ex. 3). New recruits are told: "Give us your Dreams, we'll take care of the rest." (Ex. 3).

5.   However, the supposed path to financial prosperity through the Talk Fusion Opportunity is not based on selling videoconferencing technology. Because Talk Fusion's prices and signup fees are extraordinarily high, retail sales are not feasibly profitable. With little-to-no name recognition, Talk Fusion Associates' jobs are made even more difficult in their attempt to earn meaningful sales commissions. Many of the supposed competitors of Talk Fusion, in the area of business videoconferencing, have never even heard of the company. For example, sales associates at Go To Meeting, Webex, and Intercall had never heard of Talk Fusion. Additionally, Talk Fusion's name failed to appear in an article published by "PC Magazine" that detailed the top videoconferencing software products and companies of 2015.[14]   This lack of name recognition precludes Associates from selling Talk

---

[12] https://www.youtube.com/watch?v=etPVRFRhRgE

[13] "The benefits of innovation are no longer limited to bosses and boardrooms. They are granted to people like you- who stop at nothing, and relentlessly pursued their dreams; are you ready to fulfill yours?"

[14] http://www.pcmag.com/article2/0,2817,2388678,00.asp

Fusion's products and services to larger business, especially ones that could afford the prohibitively expensive $1,499 Pro-Package signup fee. As such, Associates have little (if any) genuine chance of selling the products at retail. In fact, Associates are limited in their earning potential unless they fully invest and purchase the Pro-Package, regardless if they even want it or not. Because Associates earn so little from retail sales, their real income derives from a pyramid-scheme based on internal consumption and recruiting. Instead of selling its overpriced video products to end users, Talk Fusion generates large sums of money in the following two ways: first, current Associates' internal consumption of products and services, and secondly, the *recruitment of* new Associates (who pay the aforementioned signup fees [between $250 and $1,499] and monthly storage fees [between $35 and $215] to participate in the Talk Fusion Opportunity). New Associates are told to "Be a Product of the Product—***Become Your Own Best Customer***." (Ex. 24).

6. With their "business opportunity" inherently based on Associates endlessly pursuing to recruit new Associates--Talk Fusion does little to encourage or reward retail sales. Indeed, the compensation paid to Associates is almost altogether unrelated to retail sales. Recruits are reminded in training materials: "You don't have to be a salesperson. You not are selling anything. You will be sharing Talk Fusion's amazing video communication products and ***outstanding business opportunity***." (Ex. 4) In fact, new Associates are specifically instructed not to talk about Talk

Fusion's products' "functions" and "features," and instead focus on emphasizing the "wealth building" that the Talk Fusion Opportunity presents.[15]

7.   Associates are told to follow Talk Fusion's Rule of "2 in 72." New recruits are instructed to personally sponsor one associate on their left leg, and one associate on their right leg within 72 hours of joining ("Remember 1:1—25 dollars"; "Go Bronze"; and "if they are not doing this, they are doing something wrong.")[16] The Associates are then instructed to teach their new, personally sponsored Associates to immediately duplicate this process themselves, and personally sponsor two new Associates within 72 hours. Associates are told that if they follow the 2-in-72 Rule, and Talk Fusion's "4 Step System" of "duplication," they can "explode their team to more than 2,000 Associates in the first month," which will allow them to earn six figure incomes. (Ex. 3-7).

8.   By following Talk Fusion's recruitment-based Rule of 2 in 72, Associates purportedly reach the rank of Diamond. Upon attaining the rank of Diamond, Associates have the opportunity to drive a Mercedes-Benz (provided by Talk Fusion), take two paid dream getaway vacations each year, receive a Rolex watch and recognition rings, and earn a weekly income of $2,500. (Ex. 6). In its simplest terms, Talk Fusion's business model is best explained by Blue Diamonds John and

[15] https://www.youtube.com/watch?v=l7x2oeS7L4Y
[16] https://www.youtube.com/watch?v=Wj1cazGXZgw

Leslie: "We sign them up, and we move on, it's a numbers game."[17] The more recruits an Associate gets, as well as the more recruits that recruits gets, the higher the commissions and bonuses are for the Associate up-line.

9.  For example, prior to Talk Fusion Hall of Fame Associate Steve Mitchell (a Talk Fusion top income earner for several years) achieving the rank of Grand Blue Diamond, he amassed an astounding global downline of over 81,000 Associates in two short years. (Ex. 8). In doing so, he earned several million dollars before leaving Talk Fusion in 2013. (Id.) Thus, Talk Fusion's true business model is based on roping in more and more Associates, each of whom are required to purchase product packages at inflated prices and pay mandatory monthly service fees for the privilege of participating in Talk Fusion's business opportunity.

10. In the Diamond Rush Guide (and online videos), Talk Fusion's CEO and founder Robert Reina personally instructs new Associates on how to implement Talk Fusion's 4-Step System of Duplication: Invite, Presentation, 3-Way Call, and Get Plugged In.[18] According to Defendant Reina, Talk Fusion's system is "simple, teachable and most importantly, it can be 'duplicated.' Remember, duplication is the key."[19] In duplication, Step One is: The new recruits are told to become

---

[17] https://www.youtube.com/watch?v=Wj1cazGXZgw
[18] https://www.youtube.com/watch?v=ld1g6bQXYFE
[19] Id.

"professional inviters." Step 2: They are to have their prospects watch or attend the next available online presentation, usually given by a Blue Diamond (such as Cedrick Penn or Steven Mitchell). They are also instructed to create a sense of urgency when presenting the business opportunity, so as to accomplish the Rule of 2 in 72. Step 3: ("the most important step of the business—**Do NOT skip this step or your business will NOT DUPLICATE"**)[20]: Associates are to immediately follow-up with the prospect after he or she finishes the presentation with their Up-line Expert. Associates are also told to identify their Up-Line expert to the prospect, and share personal information about the prospect's financial goals, family concerns, and dreams/desires before the conference call. Step 4: Associates are told to introduce their Up-Line Experts, have the new recruit prepare a list of 25 potential prospects for the Up-Line Expert, and go Bronze in 72 hours ("follow the rule of 2 in 72—sponsor one recruit in their left leg and one in their right leg.") New recruits are told "your level of success will be tied directly to your ability to help others reach their goals and dreams, and that will result from them duplicating the efforts of successful Associates who came before them." (Ex. 4)

11. The business opportunity and the Talk Fusion "Dream" is not financially healthy for the new Associates. Few, if any, Associates ever cover their costs.

---

[20] Id.

Because the scheme's promoters and high level Blue Diamonds take a significant cut for themselves, Associates frequently make less than they invest. In fact, hidden in Talk Fusion's own income disclaimer is the following statement: "<u>In any case, it is rare for the Talk Fusion Independent Associate to earn any income at all.</u>" (Ex. 10). However, watching Talk Fusion's official promotional presentations, training videos, and marketing materials, one would think the exact opposite, and believe that it would be easy to get: "2 people in 72 hours" (which qualifies you for a bonus), and to follow the proven 4-Step system. (Exs. 3-7).

12. Top members of the Talk Fusion pyramid scheme are making a fortune off of the global Talk Fusion pyramid, which is operated by Talk Fusion, Inc., and Talk Fusion International, and is assisted by high level Associates, (such as Blue Diamonds), and various businesses (such as Mane World Productions, Inc). Some top Associates are making over $2 million a year, primarily generated by way of "internal consumption" from their downline Associates. Additionally, these high-level Associates earn income by sharing in the total revenue of the Talk Fusion and Talk Fusion International, Inc. leadership bonus, which ranges between 1 and 2.25% of the global enterprise's total revenue. (Ex. 13).

13. Despite the fact that all but a miniscule percentage of Associates are doomed to incur financial losses, Talk Fusion and the other Defendants--and unnamed <u>Defendant co-conspirators, such as Blue Diamond (and higher-level) Talk Fusion</u>

Associates--intentionally disseminate false and misleading statements about Talk Fusion's business opportunity to lure new Associates.

14. For example, Steven Mitchell makes the following statement in one of his promotional videos, and then proceeds to show a string of actual commissions flowing into an account (Exs. 8-9):

> "I mentioned to you earlier on about these bigger incomes that are possible, and for legal and ethical reasons, it wouldn't be appropriate for me now to start putting up actual incomes, people's incomes on the screen. ***Recognize the fact that there are individuals right now, who are putting the efforts in, that in a matter of 6 or 7 months are earning anywhere in excess of $15,000 a week right now.*** So if your goals and aspirations are the bigger incomes, and *you are prepared with the time and effort into it, uh, clearly, with Talk Fusion the potential is there for you to earn bigger incomes*." [21]

Many other Blue Diamond promoters have made similar representations to recruits in order to create the appearance that financial success at Talk Fusion is simple, and presents a great opportunity to increase their income, if they only follow Talk Fusion's 4-Step duplication system and work hard.

15. In response to Defendants' wrongful and unlawful conduct, Plaintiff seeks the certification of a class of Associates (the **"**Class"), who, like Plaintiff, became Associates in Talk Fusion's pyramid scheme, and were thereby damaged by paying sign-up fees and purchasing services, at any time from October 1, 2011 to the present. Plaintiffs seek to hold Talk Fusion and the other Defendants liable for their

---

[21] https://www.youtube.com/watch?v=hGBQSd71VNU

operation and promotion of the Talk-Fusion pyramid scheme, pursuant to the Racketeer Influence and Corrupt Organizations Act, 18 U.S.C 1961 *et seq*. (RICO).

16. In addition, Plaintiff seeks to certify a sub-class of California residents and enforce these individuals' remedial rights, under the California Business and Professions Code §§17200, *et seq*., and §§17500, *et seq*., for Defendants unlawful business practices, and for patently misleading and false advertising statements. These actions were directed at California residents, and thereby caused the citizens injury in fact, through the loss of money as a result of said actions.

## II.   PARTIES

### A. The Plaintiff:

17. Plaintiff Dennis Gray was (at all times relevant to the allegations in this complaint) a resident of the County of San Diego, State of California, and a citizen of the United States. Plaintiff was deceived by the Talk Fusion's misleading business opportunity, falsely believing it was a legitimate way to earn money, and did lose money as a result of Defendants' unfair and unlawful business practices.

### B. The Defendants:

18. Defendant Robert Reina, the president, founder, and director of Talk Fusion, is (and was at all times relevant to the allegations in this complaint), a resident of the State of Florida, and a citizen of the United States.

_____

19. Defendant Reina claims to h ave over 20 years of experience in direct marketing, and has founded several multi-level marketing companies, including Cash Card and Travel City. These business utilized a similar business model to Talk Fusion's, wherein Associates would receive commissions every time they referred a friend or customer that enrolled in the program and purchased an independent travel agent program.

20. Defendant Reina is the author of Talk Fusion's Diamond Rush marketing materials, and appears in numerous promotional videos promoting the "Diamond Rush Training" and "4-Step System" of duplication. (Exs. 3-7). Defendant Reina also hosts a monthly live global conference call with Talk Fusion's Vice President, Allison Roberts, and other unnamed co-conspirator Defendants that include Associates from over 140 countries. In addition, Defendant Reina has appeared at promotional seminars, wherein many of the same representations alleged in this complaint were made to potential recruits, including seminars held in the State of California. For example, he appears in a promotional video entitled: Talk Fusion Events California, which was used to solicit recruits in California.[22] These calls, presentations, and promotional videos allowed the pyramid scheme to expand and

---

[22] https://www.youtube.com/watch?v=hVQ7qpjYnFY

recruit additional victims in the State of California, as well as nationally and internationally.

21. Defendant Talk Fusion, Inc. is, and at all relevant times was, a corporation organized under the laws of the State of Florida, with its principal place of business in the State of Florida, and did business regularly throughout the United States, including in the State of California. Talk Fusion transacts its business in the Southern District of California in accordance with 18 U.S.C. § 1965(a) and (b) and California Code of Civil Procedures § 410.10.

22. Talk Fusion markets and sells various video communication products for both personal and business use, including Web software that allows customers to videoconference and create video-emails that can be sent to friends, family, and customers. Talk Fusion's Associates are customers of Talk Fusion, Inc. They pay for the right to recruit other Associates, and earn commissions and bonuses for this recruitment.

23. According to Talk Fusion's marketing materials, Defendant Reina got the idea for Talk Fusion while attempting to send a ten-second video via email to a friend. His service provider, AOL, said it was impossible--so Mr. Reina spoke with a computer-savy friend, Dr. Chen, who designed a revolutionary, patent-pending way to send video emails. (Ex. 15). Recently, Talk Fusion and Dr. Chen have invented another new allegedly revolutionary technology, Connect, which is being

marketed to Talk Fusion Associates in recent promotional videos, as the only service to allow users to videoconference across platforms and operating systems, without having to install third-party software.[23]

24. Defendant Talk Fusion International, Inc., is, and at all relevant times was, a corporation organized under the laws of the State of Florida, with its principal place of business in the state of Florida, and doing business regularly throughout the United States, including in the State of California. (Ex. 16) Talk Fusion International, Inc., transacts its business in the Southern District of California, in accordance with 18 U.S.C. § 1965(a) and (b) and California Code of Civil Procedures § 410.10. Talk Fusion International, Inc., operates in conjunction with the other Defendants' to market Talk Fusion internationally and obtain revenue from foreign sources. This revenue is then distributed to Blue-Diamond and above co-conspirators through the "Leadership Pool Bonus," which gives the co-conspirators between 1 and 2.25% of the total revenue of the global enterprise. (Ex. 13).

25. Defendant Mane World Promotions, Inc., is, and at all relevant times was, a corporation organized under the laws of the State of Oregon, with its principal place of business in the State of Oregon, and doing business regularly throughout the United States, including in the State of California. (Ex. 17). Mane World

---

[23] http://1864570.jointalkfusion.com/default.asp

Promotions, Inc., transacts its business in the Southern District of California, in accordance with 18 U.S.C. § 1965(a) and (b) and California Code of Civil Procedures § 410.10.

26. Defendant Mane World Promotions, Inc., provided the self-replicating websites that were used by Defendants Talk Fusion, Inc., Bob Reina, and Talk Fusion International, Inc., to market and promote the unlawful pyramid scheme. (Ex. 19). The self-replicating webpages allowed Talk Fusion to build massive "downlines", spread quickly, and allowed Defendants and unnamed co-conspirators to disseminate false and misleading statements about Talk Fusion's products and the Talk Fusion business opportunity.

27. Defendant Mane World Productions, Inc., at all times alleged in this complaint, was owned, controlled, and operated by Talk Fusion Hall of Fame Blue Diamond Mark Genovese. (Ex. 18). Mark Genovese has been in the Internet business for 25 years, and has done website and SEO work for companies in areas such as: telecommunications, health, and nutrition. He is a Talk Fusion Hall of Famer and Grand Blue Diamond. (Ex. 19). Defendant Mane World Productions, Inc., is a separate and distinct corporate entity from Talk Fusion and Talk Fusion International, Inc.

28. The above named Defendants had and have sufficient and continuous contacts with the Southern District of California in that, among other things, they

actively promoted the Talk Fusion pyramid scheme through the use of mails and wires in the district, sold products and services in the district, and promoted their businesses in the district through promotional and interactive video.

### III.   CONSPIRACY, AGENCY, JOINT VENTURE, ALTER EGO

29. Each of the Defendants named herein acted as the co-conspirator, agent, single enterprise, joint venturer, or alter ego of or for the other Defendants, with respect to the acts, violations, and common course of conduct alleged herein, and ratified said conduct, aided and abetted, or is otherwise liable. Defendants have had meetings with other Defendants, and unnamed Blue Diamond co-conspirators reached agreements to market and promote the Talk Fusion Pyramid as alleged herein.

30. Defendants, along with unnamed Blue Diamond co-conspirators, were part of the leadership team that participated with Talk Fusion, and made decisions regarding: products, services, marketing strategy, compensation plans, incentives, contests, and other matters. In addition, Defendants and unnamed co-conspirators were directly and actively involved in decisions to amend the associate agreement and compensation plans.

31. The acts charged in this Complaint, as having been done by Defendants, were authorized, ordered, ratified or done by their officers, agents, employees, or

1  representatives--while actively engaged in the management of the Defendants'

2  businesses or affairs.

### IV.   JURISDICTION AND VENUE

4  32. Defendants are subject to the jurisdiction of this Court. Corporate Defendants

5  Talk Fusion, Inc., Talk Fusion International, and Mane World Productions, Inc., at

6  all relevant times, have been engaged in continuous and systematic business in

7  California, and/or have committed tortuous acts in this state. The individual

8  Defendants have, at all relevant times, also been engaged in continuous and

9  systematic business in this state and/or have committed tortuous acts in California.

10  33. The actions giving rise to this lawsuit were taken by Defendants, at least in

11  part, in California. Plaintiff is a resident of California. In accordance with 18 U.S.C.

12  § 1965(a) and (b), the Defendants are subject to this Court's jurisdiction in that they

13  "transact affairs" in the Southern District of California and "the ends of justice

14  require that other parties residing in any other district be brought before the Court,

15  the Court may cause such parties to be summoned, and process for the purpose may

16  be served in any judicial district of the United States by the marshal thereof."

17  (U.S.C. § 1965[a] and [b]).   In accordance with California's long-arm statute,

18  California Code of Civil Procedure § 410.10, this Court has personal jurisdiction

19  over the Defendant.

20  _____

34. Because Plaintiff asserts claims pursuant to the Racketeer Influenced Corrupt Organizations Act (RICO), 18 U.S.C §§1961-1968, this Court has jurisdiction over this action, pursuant to 28 U.S.C §1331. Because Plaintiffs assert state-law claims under the California Business and Professions Code, this Court may exercise supplemental jurisdiction, pursuant to 28 U.S.C. §1367.

35. Venue is proper in this District, pursuant to 28 § 1391(b) and (c) and 18 § 1965(a) and (b), because a substantial number of the acts and transactions that precipitated Plaintiff's claims (and the claims of the classes) occurred within this District. Defendants did (or solicited) business, and transmitted communications by mail or wire, relating to their illegal pyramid, in this district; transacted their affairs, in this judicial-district; and committed wrongful acts in this district, which have directly impacted the general public (of this district), and the ends of justice do require that parties residing in other districts be brought before this Court.

## A. The Nature of Pyramid Schemes

36. While pyramid schemes can take different forms, they are at their core inherently illegal schemes, by which perpetrators induce others to join, with the promise of profits and rewards from a putative business. The reality of the schemes, however, is that rewards to those that join come almost exclusively from the recruitment of new participants/victims to the scheme.

_____

37. "Like chain letters, pyramid schemes may make money for those at the top of the chain or pyramid, but "must end up disappointing those at the bottom who can find no recruits." *Webster v. Omnitrition, Inc.*, 79 F.3d 776, 781 (9th Cir. 1996) (quoting *In re Koscot Interplanetary, Inc.*, .86 F.T.C. 1106, 1181 (1975), aff'd mem. sub nom., *Turner v. FTC.,* 580 F.2d 701 (D.C. Cir. 1978)).  As such, "[p]yramid schemes are-said to be inherently fraudulent…." *Omnitrition* at 781.

38. Pyramid schemes are characterized as: " the payment by Associates of money to the company in return for which they receive (1) the right to sell a product and (2) the right to receive in return for recruiting other Associates into the program rewards which are unrelated to sale of the product to ultimate users." *Omnitrition* at 781 (quoting Koscot at 1180); *FTC v. Burnlounge, Inc.*, 753 F.3d 878, 880 (9th Cir. 2014).

39. According to the Ninth Circuit, the "satisfaction of the second element of the *Koscot* test is the sine qua non of a pyramid scheme: "As is apparent, the presence of this second element, recruitment with rewards unrelated to product sales, is nothing more than an elaborate chain letter device in which individuals who pay a valuable consideration with the expectation of recouping it to some degree via recruitment are bound to be disappointed." (*Omnitrition* at 782).

_____

40.   The Ninth Circuit has adopted the *Koscot* standard and has held that "the operation of a pyramid scheme constitutes fraud for purposes of several federal antifraud statutes." (*Omnitrition* at 782.  *See Burnlounge, Inc. at 880).*

41. California law also renders pyramid schemes illegal. California Penal Code §327 defines an endless chain (or pyramid scheme) as follows:

> "any scheme for the disposal or distribution of property whereby a participant pays a valuable consideration for the chance to receive compensation for introducing … additional persons into participation in the scheme or for the chance to receive compensation when a person introduced by the participant introduces a new participant. Compensation… does not ... include payment based upon sales made to persons who are not Associates in the scheme and who are not purchasing in order to participate in the scheme."

42. Recently, numerous states, governmental agencies, consumers, professionals, and former participants in multi-level marketing companies have petitioned and requested that the Federal Trade Commission (FTC) investigate the MLM industry, and take action against rogue actors who employ unfair and deceptive tactics, to market their companies. *(See, e.g, In Re: Petition to Take Enforcement Action and Promulgate Trade Regulation Rule Concerning Unfair and Deceptive Acts and Practices In the Multi-Level Marketing Industry.)* In particular, these groups are concerned that companies are adopting the label of multilevel marketing and, among other things:

- Selling "business opportunities" to millions of consumers that are based upon the buyer reselling the same opportunity, *ad infinitum*, with the false promise that

exponentially increasing rewards will flow to all participants in the recruiting chain.

- Requiring MLM distributors to submit to onerous and unfair terms in their distributor agreements, including arbitration clauses, class action waivers, jury trial waivers, and provisions which permit the MLM company to make unilateral changes to the distributor agreement or compensation plan without the consent of the distributor.

- Using false claims of high income potential to entrap millions of consumers into making automatic monthly inventory purchases charged to their credit cards.

- Presenting misleading and incomprehensible MLM compensation plans which cover up the reality that more commissions are transferred to those positioned at the top of the sales chain than to those who actually make the sale, and that between 50-80% of all commissions are transferred annually to the top 1% of the sales chain.

- Utilizing deceptive Search Engine Optimization (SEO) tactics to manipulate search results so that web sites with negative or objective information concerning an MLM or the MLM industry are "buried."

- Failing to disclose failure rates, dropout rates, sources of income for those at the top of pyramid chain, and international income sources of high level US-based distributors.

43. In reality, pyramid schemes that masquerade as legitimate MLMs serve only to soil the reputation of the MLM industry. Rogue companies like Talk Fusion give legitimate operators a bad name.

44. In response, the Federal Trade Act (FTC) has been taking more aggressive steps and actions against these rogue actors, and shutting down their unlawful business operations. For example, in 2007, the FTC took action against Burnlounge Inc., for operating a pyramid scheme in violation of Section 5(a) of the FTC Act. Burnlounge was offering its associates the opportunity to participate in cash rewards in exchange for an initial fee, plus recurring monthly fees. Members were paid

1    automatic signup bonuses for selling higher priced packages to new associates. The

2    matter was heavily litigated, and ultimately reached the Ninth Circuit Court of

3    Appeal. (*See F.T.C. v. BurnLounge, Inc.*, 753 F.3d 878 [9th Cir. 2014]). The Ninth

4    Circuit rendered its opinion in 2014, finding that BurnLounge's business model

5    focused on recruitment, and that the rewards paid, in the form of cash bonuses, were

6    primarily earned for recruitment, as opposed to merchandise sales to consumers. (*Id.*

7    at 886.) The court placed an emphasis on the fact that recruiting was built into the

8    compensation structure, in that recruiting led to eligibility for cash rewards, and the

9    more recruiting the higher the rewards. (*Id.* at 884.) Thus, the court found

10   BurnLounge's focus was on promoting the bonus and commission program rather

11   than selling the company's products to end retail users. (*Id.*)

12       45. Recently, on August 1, 2015, the FTC took action against VEMMA--alleging

13   them to be a pyramid scheme. Associates were recruited to join VEMMA via

14   promotional videos, in which representations were made about its compensation

15   model and alleged income opportunities. (Ex. 20). VEMMA used a binary-based

16   compensation model similar to the one at issue in this case. Like Talk Fusion's

17   binary compensation plan, VEMMA affiliates earned financial rewards for building

18   two teams of affiliates, who were charged with recruiting additional affiliates. The

19   FTC is arguing that the emphasis of VEMMA's sales culture is recruitment, thus the

20   product is merely incidental to the business opportunity. Unlike Talk Fusion,

VEMMA had a 12-month refund policy on all unsold/unused items.  Talk Fusion Associates are given a mere three days to cancel their orders for a refund.

46. In the Diamond Rush training guide, Talk Fusion Associates are instructed to "instruct those who 'get it' to duplicate your actions by doing the same thing." In addition, Defendant Reina instructs recruits during his Diamond Rush Training Video: "Some Will, Some Won't—So What—NEXT!" and "Solid duplication begins with sorting for the right people."  (Ex. 7).

47.  Again, like Talk Fusion, VEMMA affiliates are instructed to teach those recruits to duplicate their process: "As you'll soon see, your VEMMA business is easy to set in motion and easy to duplicate. Keeping the business simple attracts others to your network. Presenting a plan that can be duplicated encourages others to make their dreams a reality." (Ex. 20 at ¶27). Talk Fusion tells its Associates that all they need to do is duplicate their plan for success. "That means that you don't have to figure out how to invite a business prospect, how to conduct a business presentation or how to follow up. THAT HAS ALREADY BEEN FIGURED OUT FOR YOU. All you have to do is duplicate what has already proven successful." (Ex. 4).

48. As discussed in further detail below, the unlawful business practices of Talk Fusion are very similar to those at issue in the VEMMA matter, in that both corporations instruct new associates about the "power of duplication," utilize 4-Step

recruitment systems, provide their recruits with similar marketing materials, use similar misrepresentations about income potential and ease of success at the business opportunity, and solicit new recruits in a similar manner (requesting that recruits focus on recruiting "liked minded individuals").

## B. The Talk Fusion Pyramid's Basic Structure

49.  Since at least 2007, Talk Fusion has been operating and conducting business in the State of California.

50. Defendant Talk Fusion purports to be a lawful and legitimate company engaged in the "relationship marketing" of video conferencing products. According to their webpage, Talk Fusion runs "directly on the power of people talking to people."[24] People in "over 140 countries" are paid to market Talk Fusion's video products and alleged business opportunity. [25]

51. In reality, Talk Fusion is an enterprise that is, and always has been, an illegal pyramid scheme. This enterprise will hereinafter be referred to as the "Talk Fusion Pyramid."

52. The Talk Fusion Pyramid operates by offering prospective participants the opportunity to become "Associates" who allegedly will pay for the right to enroll

---

[24] http://www.talkfusion.com/en/opportunity/

[25] *Id.*

1   others in the Talk Fusion scheme, and earn commissions once these recruits are

2   "Active and Qualified." (Ex. 22 at p. 10).

3   53.  Defendant Talk Fusion labels all individuals who participate in the Talk

4   Fusion Pyramid as Associates.

5   54. Defendant Talk Fusion compensates all of its Associates in accordance with

6   what it terms "The World's First Instant Pay Compensation Plan." (Ex. 21, 22).

7   55. The basic terms of its compensation are set forth in a compensation plan,

8   available on Defendant's website.

9   56. From at least 2011, Defendant Talk Fusion has utilized a compensation-plan

10  document that describes a compensation structure that amounts to a fraudulent and

11  illegal pyramid scheme, both by its very terms, and by its implementation in practice.

12  This compensation document is attached as Exhibit 22, and is incorporated herein

13  by reference.

14  57. Prospective participants who meet certain criteria, enter the company as

15  either an Associate or Active Associate—which means they are eligible to receive

16  bonus commissions. Both Associates and Active Associates are required to pay a

17  one-time fee of $39.00. (Ex. 2, 22 at p. 5).

18  58. Although the Compensation Plan provides that one may join Talk Fusion as

19  an Associate, and not purchase a product, Talk Fusion is recruiting participants to

20  join as Active Associates, which requires the participant, in addition to the $39.00

one-time fee, purchase a product package (costing $250 for the Executive, $750 for the Elite, and $1,499 for the Professional), and pay a monthly storage fee ($35 to $215 a month). (See. Ex. 22 at 5, 30).

59. To be considered Active, according to the Talk Fusion Compensation Plan, an Associate must personally generate a onetime Personal Sales Volume of 50 points, and maintain a minimum 10 Personal Sales Volume Points on a monthly basis, going forward. Personal Sales Volume is sales volume generated from personal product purchases, made by the Associate or by retail customers.  (Ex. 22, at p. 10).

60. In addition, all Associates and customers who purchase products are required to purchase a mandatory subscription fee, ranging from $35 to $215 dollars a month. (Ex. 22 at p. 12).

61. Given the signup fees for the product packages ($250, $750, and $1,499), and the availability of free individual substitutes on the internet, as well as business level web-conferencing software offered by: Webex, Adobe, Centrix, GoToMeeting, et al., (some of which are free), the vast majority of Associates simply purchase the products themselves, and pay monthly storage fees, to remain Active and qualify for bonuses and commissions. (Id.)

62. After joining—and buying either a $250, $750, or $1,499 product package, and paying the necessary monthly storage fee—a new Talk Fusion Associate then

ostensibly has the ability to sponsor other Associates, and advance to higher ranks in the Talk Fusion Pyramid (see discussion below).

63. The basis for promoting Associates to higher positions in the corporation is not success in selling products or services, but rather the recruitment and sponsorship of new Talk Fusion Associates—those in his or her "downline" (i.e., Associates below them on the pyramid). This is because rank advancement is dependent on the Associate obtaining a number of cycles in their downline, which is essentialy the recruitment of new Associates. Newly recruited Associates are placed in one of two legs in the Associate's "binary tree," and subsequently constitute a numerical value of product and service purchases for the recruiter.

64. The opportunity to earn commissions and residual income for life is the main selling point of the Talk Fusion "business opportunity." Commissions are paid out using a binary compensation structure: the recruiting Associate is at the top, and his two subsequent recruits (who have purchased product and service packages, or "Sales Volume") are each placed in one of the two left/right binary tree legs. Once each leg reflects a minimum of 100 Sales Volume, an Associate earns a $25 payout. Each $25 payout is referred to as a binary cycle.

65. There are 16 ranks in Talk Fusion's compensation plan of the Talk Fusion Pyramid. The ranks are based upon an Associate's ability to recruit new Associates, which dictate the earning rates of the Associate. (Ex. 10).

**1. Bronze:** 1 Binary Cycle**.**

"The first significant position. Go bronze. 2 and 72 that's our role, that's our motto that's we do. You have to get your first 2 partners in the first couple days."[26]

"Immediately you want to help your prospect make sure that they develop their top 25 prospect lists. Who are the top 25 people they know ***who want to start making money instantly***? Those of the people you want to write down on the list and start contacting immediately. Because your goal is this, we say its 2 and 72, which means sponsors 2 associates, one on your left leg and one on your right leg within the first 72 hours. That means that you're Bronze. ***You simply repeat that behavior with her personally sponsored associate's and at that time become a bronze maker, which is the absolute core of the talk fusion compensation plan***."[27]

2. **Silver:** 5 Binary Cycles**.**

3. **Gold:** 10 Binary Cycles**.**

4. **1 Star:** 20 Binary Cycles**.**

5. **2 Star:** 30 Binary Cycles**.**

6. **3 Star**: 50 Binary Cycles**.**

7. **Diamond:** 100 Binary Cycles**.**

"Next significant position is go Diamond, baby. That's 100 cycles in a one week that ***six-figure a year income*** when it comes from the comfort your home. And we can't guarantee you no income with your work ethic, we don't know your background, we don't know your follow-up coach in training, ***but know this people in this company are making more then these to work on the job in a week then they did a year that's exciting.***"[28]

---

[26] https://www.youtube.com/watch?v=l7x2oeS7L4Y
[27] https://www.youtube.com/watch?v=ld1g6bQXYFE
[28] https://www.youtube.com/watch?v=l7x2oeS7L4Y

28

8. **Double Diamond:** 150 Binary Cycles**.**

9. **Triple Diamond:** 200 Binary Cycles**.**

10. **Diamond Elite:** 250 Binary Cycles**.**

11. **Blue Diamond:** 500 Binary Cycles**.**[29]

"Qualified Associate who go Blue Diamond and above share in a percentage of the total Sales Volume generated through Talk Fusion WORLDWIDE" (1% to 2.25% of the total revenue). (Ex. 18).

12. **Grand Blue Diamond:** 1,000 Binary Cycle**.**[30]

13. **Royal Blue Diamond:** 1,500 Binary Cycle**.**

14. **Presidential Blue Diamond:** 2,500 Binary Cycle**.**

15. **Ambassador Blue Diamond:** 5,000 Binary Cycle**.**

16. **Imperial Blue Diamond:** 7,500 Binary Cycle, with at least one personally recruited Grand-Blue-Diamond-ranked affiliate in both binary teams**.**

    66. Defendants recruit Associates, and entice them to purchase products, services, and related marketing materials through false material statements and omissions, and then distribute proceeds of these sales to new recruits, at rates based almost exclusively on participants' recruitment of new victims—rather than on the

---

[29] As of the filing of this action, less than 20 associates out of Talk Fusion's one million associates have achieved the rank of Blue Diamond or Grand Blue Diamond.
[30] *Id.*

sale of products to retail users. Blue Diamond and above co-conspirators then siphon off 1% to 2.25% of the total global revenue from Talk Fusion, Inc. and Talk Fusion International, Inc., to further enrich themselves.

67. As a result of investing in the scheme, Plaintiff and the Class have suffered millions of dollars in losses.

**C. Defendants' Enterprise Constitutes a Pyramid Scheme**

68. Defendants have operated and promoted their fraudulent scheme through the use of the U.S. mail and interstate wire communications. Through their creation and operation of their pyramid scheme, Defendants specifically intended to, and did in fact, defraud their Associates—including Plaintiff and the members of the Class.

69. The first part of their illegal pyramid scheme consists of an alleged MLM business run by Talk Fusion. At the bottom rung of this operation is a network of so-called Associates. Talk Fusion purports to sell its video products and services through the Associates, but, in fact, few of Talk Fusion products are ever sold to anyone other than its Associates. Unlike legitimate MLMs, that offer reasonable prices for a product with legitimate market value, the prices Associates pay for Talk Fusion's products (and associated costs) are so high that the prospect of genuine retail sales is virtually naught. Because its Associates are the actual customers and ultimate users of its products, Talk Fusion requires an ever-expanding network of new Associates in order to keep Talk Fusion afloat.

70.  Under Talk Fusion's Compensation Plan, Associates are able to earn income primarily from only two sources: (1) bonuses for recruiting and sponsoring new representatives, and (2) commissions from sales of products and services to themselves and the recruits in their "downline." (Exs. 21 and 22).

71. Talk Fusion operates as an illegal pyramid scheme because its compensation plan revolves around a recruitment-oriented message, in which an Associate's compensation derives from successful recruitment of new Associates. "Courts . . . have consistently found MLM businesses to be illegal pyramids where their focus was on recruitment and where rewards were paid in exchange for recruiting others, rather than simply selling products." (*F.T.C. v. BurnLounge, Inc.*, 753 F.3d 878, 885 [9th Cir. 2014]). An Associate receives rewards which are unrelated to the sale of products or services to ultimate users outside of Talk Fusion. *See United States v. Gold*, 177 F.3d 472, 480 (6th Cir 1999) (quoting *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1187 [1975]). Such a scheme is deemed inherently fraudulent under federal law. (See also *FTC v. Burnlounge* 753 F.3d 878 [2014 9th Cir.])

72. New entrants into this pyramid scheme are effectively required make a minimum initial investment of $679 (or $1,958 for the Pro-Package), by paying a onetime $39 fee, purchasing at least the $250 Starter Package (if not the $1,499 Pro Package, which allows the Associate to earn larger bonuses/commissions, and is touted by Talk Fusion "as the best value"), and paying a minimum of $35 a month

1   in storage fees. All of these exorbitant costs are paid in order to stay Active and

2   Qualified, which is necessary to be compensated under the scheme.

3   73. Because Talk Fusion's Associates essentially do not sell products to

4   consumers (who are not also Associates), they only obtain return on their investment

5   by recruiting new Associates (which then buy products). This results in payouts

6   alleged to be "bonuses" and "commissions." Completely contrary to the law, Talk

7   Fusion forces its Associates to make these purchases, and disingenuously attempts

8   to categorize these purchases as sales to <u>customers</u> or "ultimate users," in order to

9   meet its legal obligations of reoccurring retail sales. When a company incentivizes

10  the recruitment of new participants over product sales, rewards to participants are

11  not considered sales to ultimate users. (*Id.* at 887; *See United States v. Gold*, 177

12  F.3d 472, 481 [6th Cir 1999]).

13  74. Talk Fusion is a classic pyramid scheme with a charismatic leader/founder at

14  the top of its enterprise. In this case, Defendant Reina is that leader, toting the new

15  "Next Best Thing." Defendant Reina is supported by various businesses and

16  individuals (usually high ranking representatives of the company), such as the Blue

17  Diamond co-conspirators, who disseminate its marketing materials, and promote the

18  scheme to individuals through seminars, promotional videos, and websites. These

19  conspirators instruct other "liked-minded" individuals to duplicate their "system" as

20  soon as possible, to further the conspiracy.

75. This practice should immediately be enjoined under California's Business and Professions Code Sections 17200 and 17500.

**1. Recruiting presentations by the Defendants, and others at the top of the Talk Fusion Pyramid, emphasize recruitment of new associates over the sale of products and services to customers outside of Talk Fusion**

76. The Defendants, and Blue Diamond co-conspirators at the top of the Talk Fusion Pyramid, appear in promotional videos and present marketing materials that consistently emphasize _recruitment of new Associates over sales of products and services_ to customers outside of Talk Fusion.

77. For example, Talk Fusion Hall of Fame member and Blue Diamond, Cedrick Penn, in his weekly motivational Diamond Rush Guide training session with new recruits, routinely emphasizes recruitment over product sales.

78. For further example, in his July 22, 2015, live-training sessions, Penn makes statements about his income growth by implementing Talk Fusion's 4-Step Duplication System.[31]During the presentation, there was no disclosure regarding the average earnings of the Associate, as required by the Federal Trade Commission:

*"My business exploded – it literally exploded. And I'm telling you, what we're about to do, it'll even explode even more. Instant pay, one-to-one binary, $25 cycles, Mega-Match bonuses, car programs -- this thing will get, it'll get, it'll get out of control. It will get out of control. It'll get out of control. When I learned this, ladies and gentlemen, I wish I could get my ol' dad in so he could this. When I did this, when I started teaching this, my income was about*

---

[31] https://www.youtube.com/watch?v=l7x2oeS7L4Y

**$50,000 a month, when I started -- about 90 days later, I was up in the 140's and 150's, in 90 days.** And it wasn't nothing magical."[32]

79. Shortly after discussing the Talk Fusion's 4-Step Duplication System, and the "explosive opportunity" for wealth that Talk Fusion's "duplication" system represents, Cedric Penn specifically admonishes new Talk Fusion Associates that they should not talk about Talk Fusion's products to prospective recruits, because "it does not work."

80. According to Mr. Penn, if new Associates talk about Talk Fusion's products to new prospects they "won't get wealthy" and, "they will struggle" using Talk Fusion's system.

"That's why I get a kick out of people. [Stammering.] People say what? You don't talk about our products; listen, **I'm not anti-product, I'm pro-duplication. I am pro… Listen you will not get wealthy with products, listen to what I am telling you all.** You talking with someone who's been in this business for 25 years, at the highest levels. At the highest levels, I've been to four different companies. Million-dollar earner, multiple times, at four different companies. I know what I am talking about. **If you listen, you, you will get results you. If you don't listen, you will struggle. I don't care what you background is. I don't care how much money you made in traditional business. I don't care. You won't do it here. Because it doesn't work.**… And I hear you all say: I'm coachable. No you're not. Ninety-five percent of you all are not coachable. I love you, but you are not coachable. You're not. Because I am teaching you, and coaching you, and **showing you exactly what to do.** So, either you're coachable, coachable means, I'm listening and learning and applying. You might be listening, learning, but you're not applying… So who's only here, is going to take what I teach you and apply it. I want it in the chat."[33]

---

[32] https://www.youtube.com/watch?v=l7x2oeS7L4Y
[33] Id.

81. Cedric Penn then goes on to give an example of how he had made millions of dollars, at multiple companies, using systems similar to Talk Fusion's 4-Step system--by not talking about the company's products, but instead focusing on selling the "business opportunity."

> "I'm telling you it works, man. It works. It works man. I don't care… Listen you all, I laugh about it because it's funny. ***Man, I was in number one earner in a nutrition company. And I probably had the worst health out of everybody in the company. But I made the most money.*** And there was people in the company that came before me. I didn't launch the company; the company already had launched. The difference was, our team had systems and their team didn't."[34]

82. Mr. Penn further goes on to instruct Talk Fusion Associates as to why they should not discuss Talk Fusion's products with prospects: if Associates start talking about the features and functions of Talk-Fusion products, then the potential prospect might ask questions about the product, such as what does it do, what is this, what is that. According to Mr. Penn, Associates should focus on selling the timing and potential for wealth that the Talk Fusion Opportunity presents.

> ***"I'm tellin' you: systems, systems.*** I remember this lady got up and said, Mr. Penn can I ask you guys a question. There was a panel of us. Can I ask you guys a question? Please do not be offended. I'm not going to be offended. Can you or the other gentleman answer question?  Why do you guys don't get questions about your weight? When we're in a nutrition Company. That don't come up. I said nobody's never asked me about my weight, because I'm not talking about. ***I am talking about making money. You're talking about losing weight, and I'm talking about getting wealthy. That's why I'm***

---

[34] Id.

***up here and you're down there. You're worried about what's in the shake, and I'm selling the opportunity.*** Big difference. You sell the taste, I'm going to sell the timing. Remember that. I'm a… ***You sell the taste, and I am going to sell the timing. And let's see who wins***. Remember that. Sell the taste, sizzle, and I'm going to sell the timing, and I will out run you every single time. ***Because human nature is, when you start talking about what's in here, people gonna start, what is in it, what is that, what's the, what is that, what is that, why I gonna do that. I don't care what it does. What I care about is leverage***. Remember that all you all. Leverage: the predictable outcome of our business is speed, velocity, and leverage; not the taste."[35]

83. Most telling about Mr. Penn's view of Talk Fusion's products, and the relative importance of its product sales, is his statement to the effect that he doesn't care about Talk Fusion's email features and functions. What he does care about, and wants Associates to care about is the "business opportunity," to create wealth using Talk Fusion's 4-Step Duplication System.

***"When I get people, I get a kick out of them, Mr. Penn that template is beautiful. I could care less what that template looks like. You all care about what it looks like. I don't care. I care that when you hit send it goes. That it works. That our system is reliable. That Bob pays on time. That I have an opportunity to create wealth for my family. That's what I care about. I don't care about the little nuances of this and that. I could care less. I can't cash that.*** I can't donate that. I can't sow that into my church. I can't give that to the elderly. I can't feed the underprivileged. I can't send the kids to college that don't have the money, on the taste, but I can on the timing."[36]

84. This emphasis on recruitment over product sales comes from the top of Talk Fusion. In fact, Defendant Reina, as Founder and CEO, appears in numerous new

---

[35] Id.
[36] Id.

recruit-training videos discussing "the proper way" new Associates should succeed at using Talk Fusion's business opportunity.  (Ex.3-7).



"Hi, I am Bob Reina founder and CEO of Talk Fusion and welcome to the diamond rush fast track training. Over the next few minutes, *I'm going to share with you the proper ways to build your Talk Fusion business*. I am going to show you what to do, how to do it, and also can explain you why we do it this way. All the top leaders in the business are following this system to make their dreams come true."[37]

85. Like co-conspirator Blue Diamonds, Defendant Reina reiterates that new Associates should invite prospects by asking them if they are "interested in making money."[38]

---

[37] https://www.youtube.com/watch?v=ld1g6bQXYFE
[38] Id.

1




## Invite Question

**Have you heard of a company named Talk Fusion?**

As Facebook revolutionized Social Media, Talk Fusion is doing the same thing to the next big Internet craze: video. Best of all, they are paying people to do it.

By 2015, 90% of all Global Internet Traffic will be video based. This makes Talk Fusion the number one in-demand product in the world.

All you do is ask people if they are interested in making money and invite them to a quick 20-minute Online Presentation.  There are no meetings necessary, no face-to-face selling and no convincing.

*FAST TRACK*

TALK FUSION

"It's a very simple invitation, which is working for people all over the world. And they are having great success with it. It goes like this, have you heard of a company called talk fusion. As Facebook revolutionized Social Media, Talk Fusion is doing the same thing to the next big Internet craze which is video. Best of all their paying to do it. By the year 2015, 90% of all global Internet traffic will be video based. This makes Talk Fusion the number one in demand product in the world*. All you do is ask people if they're interested in making money and invite them to a quick 20 minute* online presentation. There are no meetings necessary, no face-to-face selling, and no convincing. If I can show you how to earn money today, would you take 20 minutes learn more and then you simply just direct them to the next online presentation by giving them the time."[39]

86. Like Mr. Penn's speech on "timing," defendant Reina emphasizes the necessity to invite prospects with "excitement" and "urgency," and to get the new

[39] Id.

Associates to do likewise. As in Mr. Penn's statements above, Reina emphasizes the timing of the pitch of the "business opportunity, not product sales to consumers.

"Step 4 get plugged in. You have to remember this, associates are never more excited in the minute they join. At that point in time they connect how their dreams can come true by building a successful Talk Fusion business. Immediately, what you need to do is to introduce your prospects to your up line experts. Begin to develop the relationships within the network. Remember this is a team sport. So you want to make sure that they are introduced to multiple people in the up-line, because they will know that they have a great team available to help them at all times. ***Immediately you want to help your prospect make sure that they develop their top 25 prospect lists. who are the top 25 people they know <u>that want to start making money instantly</u>*** those of the people you need to write down on the list and start contacting immediately because your goal is this, *we say it is 2 and 72, which means the sponsor two associates 1 on your left leg and 1 on your right leg within the first 72 hours. that means that your a bronze you simply repeat that behavior with her personally sponsored associate's and at that time you become a bronze maker which is the absolute core of the talk fusion compensation plan.*"[40]

---

[40] Id.



87. Further emphasizing that the type of product sold by Talk Fusion is irrelevant to the business opportunity and the ability to create wealth, is Defendant Reina's "Flower Shop" example, given during a Diamond Rush Training Session. He states that it does not matter whether the Associate is selling "flowers" or "video communication products," the emphasis is on selling the opportunity and leverage. This example was given by Defendant Reina at numerous training seminars across the country, to Talk Fusion Associates.[41]BN

*"For a flower franchise it was $750* -- that was her cost to get started. Included everything: some starting inventory, our store front – anything we needed to get their business moving. And it's our responsibility to stay in business – that we just had to make sure, *make sure that we sold $50 worth*

_____

[41] https://www.youtube.com/watch?v=duniGuvq3iU

*of flowers each month*. But it's even cool though, because we can even become our own customer. So we could even buy the flowers to use them at our office or at our home. We just had to make sure so – everybody understand so far? Seven-hundred fifty bucks starts a flower franchise. Fifty dollars a month is what you're spending on your flowers. Everybody got that so far? *And in order to help expand our business, besides finding customers, we wanted to go out and find other people who wanted to open up their own flower store. Right? Everyone with me so far? So. There cost to get started would be the same: 750 bucks, and $50 a month.* And each month we would want to find at least two people willing to open up their own franchise. We're looking for people that want to make money. Right? With me so far? Is everybody – no objections so far? Everybody is good? Right? Kay. And it's our responsibility, when they open up their flower franchise, to train them to make sure that they are selling the product to customers, fifty bucks a month, or, and finding two people to open up their own flower franchise. So, this, everybody is just responsible for two people each month. You with me? *So, the question I have for you is this, if that's what I asked you to do, would you open the flower franchise, if you knew your predictable outcome, for opening it would be over a half million dollars you would make within your first eight months?* That's the question I have for you. And your answer would be? [Audience: "Yes"]. Kay. Now, is there anybody around that would say no? Is there anybody that you know that would say no? Is there anybody that, second generation would tell you no? Of course everybody would say yes, right? Because it makes sense.

Now obviously we can't make income claims with what we're doing at Talk Fusion, *but, would it matter to that person, if they were marketing and moving flowers or they were marketing video communication products, with a video email that they could use to build relationships with people? But it's not fifty bucks a month, it's only thirty-five dollars a month. Would that make a difference to somebody? [Audience: "No, why would it."] And then there's, there's your answer.* See. The reason why people don't get involved in our business is because they don't understand the business. That's really the reason why. And people have a tendency at times to get in the way, to complicate things, and to explain things to people, um, and that's why one of the keys, why people will either make it big or not make it. Those people that make it big *respect and understand the model itself, that it involves leverage*…"[42]

---

[42] Id.

88. In sum, in the words of its own leaders, products are irrelevant to an Associate's success with Talk Fusion. As Defendant Reina demonstrated in the "flower shop example," it does not matter if the product is "flowers" or "video communications products." Furthermore, as Mr. Penn's statement—that he "doesn't care" about the "features" and "functions" of Talk Fusion's email products demonstrate—the emphasis of Talk Fusion's "business opportunity" is recruiting new Associates, to obtain greater bonuses and commissions.

89. At all times alleged in this complaint, Defendants used, among other things, telephone lines and internet transmissions involved in interstate commerce, to recruit new Associates into the Talk Fusion Pyramid. In addition, Defendants disseminated false and misleading statements to individual representatives, with the assistance of Defendant Mane Productions, Inc.

**2. Official Talk Fusion training materials emphasize recruitment of new members over the sale of products and services to customers outside of the Talk Fusion Pyramid.**

90. Defendants provide new Associates with official Talk-Fusion written training materials, which emphasize recruitment of new associates over products sales. Specifically, new associates are provided with Talk Fusion's "Diamond Rush Training Guide," "Diamond Training Slides," and "Talk Fusion Opportunity Slides"

(which are attached as Exhibits 2-7). Associates are encouraged to attend webinars, seminars, and workshops put on by members of the Pyramid, including high-ranking Talk Fusion officers and other Blue Diamond co-conspirators.

91. Associates are told if they follow the guide they will be successful and create great wealth with Talk Fusion (Go Diamond in 200 Days: Earn $2,500 weekly income, Hawaiian Dream Getaway, Rolex Watch, Mercedes Car Bonus, and Recognition Rings). (Ex. 6).



92. This guide provides specific rules and instructions for recruiting new Associates into Talk Fusion. New associates are told: "you don't have to be a salesperson." Furthermore, they are told to become system-dependent, and that products alone will not create duplication: systems do." (Ex. 4).

_____



93. Recruits are told by Blue Diamonds (in training videos) that if they follow the Diamond Rush Guide, and apply the 4-Step System, they can obtain six-figure incomes[43]:

> "But I want to share something with you tonight, I think that you walk away with a plan to go diamond, and, you know, that's the pinnacle of our comp plan is getting to diamond. That opens up the dream getaway to Hawaii, that opens up the six-figure income from home, really allows you start living life the way you are supposed to live*. Six figure income from home. Who's excited about six-figure income from home?* If you are, type it in the box. Excited about six figures from home. Alright cool."

---

[43] https://www.youtube.com/watch?v=l7x2oeS7L4Y

94.    Associates are also told that successful Talk-Fusion Associates are following the Diamond Rush Guide, and teaching it to other Associates, and they need to find these "like minded" individuals.

"Number two: this is critical, nothing will happen until you identify 3 to 5 runners. 3 to 5 runners. Kay? Now, what's my [stammering] what's my meaning of a runner? This is a runner. Kay. We heard… We use the word leader all the time–leaders, runners, kay, I want you guys to understand that you can't go to the higher pin levels, until you have been 3-5 key runners in your business, that you can work with. Kay? 3 to 5 key runners that you can work with. Alright? So, what makes a person a runner? Number one, number one: their plugged into the system. ***They know the Diamond Rush, they do the Diamond Rush, they teach the Diamond Rush, they promote the Diamond Rush. That's the first thing a runner does***."[44]

95. Talk Fusion's Rule of 2 and 72 appears on pages 15 and 16 of the Diamond Rush Guide; this is the basis of Talk Fusion's "business opportunity" and Talk Fusion's business model. (Ex. 4). Recruits are told if they follow the guide they can be making six-figure income with Talk Fusion within 28 to 30 days. (Ex. 3-7).

"Go Pro, 2 in 72 that's our motto that so we do you have to get your 2 in the first couple days now you see instant Pate work and the finest and your account you sponsor personally one on you left and one on your right. There now Bronze. Next position, go Diamond, baby. That's 100 cycles in a week; that's six-figure income."[45]

---

[44] https://www.youtube.com/watch?v=l7x2oeS7L4Y

[45] Id.

96. The 4-Step Duplication System, which is set forth in the Diamond Rush Guide, is presented in training materials, on websites, and in weekly seminars given by Blue Diamonds. The Four Steps are as follows: 1) Invite, 2) Presentation, 3) 3-Way Call, 4) Get Plugged in. (Exs. 3-7).



97. Below are images of Defendant Reina instructing new Associates on how they properly employ the 4-Step system to be successful with Talk Fusion.



**Step 1:**





**Step 2:**

"Step 2 is the presentation simply have your prospect watch or 10 the next available presentation urgency is the key to getting people to the next presentation. Remember we have about 20 going on daily and multiple languages from around the world the prospect will get to see the products business opportunity testimonials and are in our system of duplication."[46]



**Step 3.**

"Now let's move on it step 3 which is through a call which is very critical do not get the step or I will promise to your business will not duplicate right after the call you follow-up immediately after the presentation with their up line sponsor make sure you edify your first edification simply means you settling nice about them borrow their credibility prestige and experience even if they sign up after the presentation you always want to introduce them to your up line's this is a team sport so you want people to develop the right mindset of community."[47]

---

[46] https://www.youtube.com/watch?v=ld1g6bQXYFE
[47] https://www.youtube.com/watch?v=ld1g6bQXYFE



**Identify Prospects' Hot Buttons**

**FORM Method: Relate to the Prospect**

**F – FAMILY**     Would they like to spend more time with their family?

**O – OCCUPATION**     Are they in a job that they do not like, or are they not being paid their worth?

**R – RECREATION**     If they had more free time, what would they do?

**M – MONEY**     Do they need a new house, new car, to pay off debt, or take a vacation?

FAST TRACK        TALK FUSION

## Step 4:

"20/20 vision it's very important; what it means is quickly as you can you want to talk to 200 prospects, on average if you do it properly you will sponsor one out of 5 which means you 20/20 personally sponsored associate on your left and 20 personally associates on her right. This will set the foundation for you for Diamond the level of Diamond which equals about $2500 per week or hundred thousand US per year and along the way you will earn the Mercedes car bonus within 2 to 5 years. Can you find 40 people who are serious about changing their lives? Of course you can."[48]

---

[48] https://www.youtube.com/watch?v=ld1g6bQXYFE



98. In closing, Defendant Reina reiterates that new Associates should follow the 4-Step System, and not deviate from the program, as this will interrupt the duplication process.

> "As you can see 4 step system is so easy they can be duplicated by everybody and remember *if it's not in the 4 step system please do not do it cannot be duplicated* so once again and thanks again we look forward to helping her dreams come true."[49]

**3. Talk Fusion's products are only purchased by Associates to gain eligibility for commissions.**

---

[49] Id.

99. The three product packages offered by Talk Fusion (the Starter, Executive, and Professional), cost from $250 to $1,499, and require monthly storage fees of $35 to $215. These fees are used to pay the new Associates' bonuses, and continue the cycle of endless recruiting, as well as create additional revenue to be transferred to the top 20 Blue Diamonds through the "Leadership Bonus." (Exs. 12-13).

100.     All three packages basically provide the same components: video chat, live meetings, video email, video newsletter, and a voice log:

**Executive (Starter):**

The Executive Package comes with Talk Fusion's Connect, video chat, live meetings, video email, video newsletter, and a voice blog—and costs $250. New recruits are told they can earn up to $1,000 per week if they purchase this product.

**Elite:**

The Elite package comes with Connect, video chat, live meetings, video email, video newsletter, and a voice blog. New recruits can increase their alleged earnings potential up to $10,000 per week if they purchase this product.

**Pro:**

The Pro Package comes with Connect, video chat, live meetings, video email, video newsletter, and voice blog. New recruits increase their alleged earnings potential to $50,000 per week if they purchase this product.

_____

54

101.    The real difference between these product packages, however, is their effect on the compensation plan, and the amount of commission an Associate can earn. An Associate's ability to earn derives from the product package they purchase upon joining Talk Fusion, and not retail sales. The potential commissions and Associate can earn are as follows: $1,000 a week with Executive, $10,000 a week with Elite, the $50,000 week for Pro. (Ex. 2).

102.    Associates are duped into purchasing the $1,499 Pro Product, which they neither have any use for, nor would ever ordinarily purchase but for the potential

income opportunity. Associates buy Pro under the false pretense that they will earn higher commissions and bonuses. In fact, Talk Fusion's compensation plan states: "You can maximize the Compensation Plan by being a Pro Associate." (Ex. 22).

103.    They are also instructed by Blue Diamonds during recruitment (and training seminars) that they should "Go Pro" as soon as possible, and purchase the Pro product through an upgrade, if they want to increase their chances of receiving higher commissions and bonuses from Talk Fusion.

104.    Hall of Famer Blue Diamond Cedric Penn often uses the income potential of the Pro-Package as a marketing tool, in persuading prospects to purchase more expensive packages, that the individual normally would'nt have purchased, but for Talk Fusion's so-called business opportunity. He instructs new Associates in training videos to do likewise:

> "So that's why, when I sit down with somebody, I pull out, ***I pull out, the little bar chart that talks about the ranks, and talks about how much income is on those ranks.*** And what I do, is I ask them, I say point to where you want to be right now. Point to where you want yourself to be. And that's how I know if they say diamond or above, or they'll point at blue diamond, or grand blue diamond. [Inaudible] I tell them no, but get ready to sign up. ***If you sign up down here you can't make that kind income.*** 'Kay? So that's important, that's important that we set the right tempo on the front side of the business. It's important to set the tempo on the front side of the business by going pro the right way. Alright? ***So it's important. Go pro***. And you want to create that kind of dynamics on the front side. ***Cause if you, if you're executive, there's no way in the world they can make Diamond income. So don't set people up to fail."*** [50]

---

[50] https://www.youtube.com/watch?v=l7x2oeS7L4Y



105.    In another video, Mr. Penn stresses the fact that the Pro Package is superior, because it offers a greater opportunity to earn more money. He also specifically instructs new Associates to upgrade to the Pro plan as soon as possible, so they can earn more money with Talk Fusion.

"But you know what nothing happens until you get started that's why get started get started grabbed associate there now are one-time fee but that doesn't do anything until what pick a package pick is a description plant is and start sharing. The ladies and gentlemen here are the package's first packages is called go pro you get connect video checked live meetings video email via newsletter was what you can customize those products anywhere you can remove the logo and for your letter to more partly you can earn up to $50,000 a week from the company are own home 2nd position is called delete still get all or incredible products still able to customize them but now

you can earn up to $10,000 a week and commissions and then there's the last position the executive for over $300 you the products of the station but still have the opportunity earn up to the dollars a week bullets excited about or company mindset is we don't want to leave anyone behind so someone doesn't have 1499 get in at 750, start make some money get them its them pain or life and an upgrade and just pay the difference if you don't have some 50 get and 300 get in where you fit in but don't miss this opportunity to Mrs. being the part of the **next Facebook of Twitter or Microsoft her Apple** called talk fusion its bold, visionary, innovative. You get at 300 you can upgrade pay the difference is some 50 when you like it's better income starts following and I are able to upgrade to pro and never to leave any money on the table. I love that about our incredible company. ***The choice is really yours what you want to do you want to limit your dreams metric earn income or increase or income to fill your dreams.***"[51]

106.    Blue Diamond Hall of Famer Ron Wright appears later in Mr. Penn's video, and states that Associates' upgrade to the Pro-Package is a one time "out-of-pocket" expense that will allow them to take full advantage of Talk Fusion's "business opportunity."

> ***"If you're not Pro, go ahead and upgrade as fast as possible***. Because if you believe in Talk Fusion, believe this is the future, this is the company to take to your dreams. ***That's a one-time cost that you pay out-of-pocket, get yourself positioned to take advantage of all the Talk Fusion has to offer.***"[52]

107.    As mentioned above, an Active Associate becomes Qualified for bonuses and commissions based on sponsoring new associates and meeting a certain personal sales volume quota. An Associate's rank in the Talk Fusion corporation is based on how many Associates are in the participant's downline and how many

---

[51] https://www.youtube.com/watch?v=etPVRFRhRgE
[52] https://www.youtube.com/watch?v=l7x2oeS7L4Y

product packages and monthly storage contracts are being purchased by the downline. (Ex. 21-25). The more product packages and monthly storage contracts sold in the Associate's "downline," the greater the bonuses and commissions he qualifies for. Once an Associate reaches the Blue-Diamond Associate level, they can then share in a percentage (from 1% to 2.25%) of the Talk Fusion's total global revenue. (Ex. 13).

108.     In sum, Talk Fusion's emphasis on selling packages to recruits is not based upon real consumer demand for its products, but instead by the new recruit's desire to earn greater commissions and bonuses under Talk Fusion's compensation plan (which is recruitment based).

### 4.   Commissions ostensibly earned on sales of products and services are, in fact, tied to recruitment of new managers.

109.     Talk Fusion relies on the promise of Team Commissions and residual income for life to lure new Associates into their pyramid scheme. In practice, Talk Fusion accomplishes this goal by having Associates buy products and monthly packages, and recruit other new Associates to do the same.

110.     Talk Fusion declares in their compensation plan that a product purchase is not necessary to become an independent associate and participate in the compensation plan. However, binary sales volume is directly tied into an Associate purchasing a product package to participate in the Compensation Plan. To qualify for team commissions, the Associate must purchase an Executive (or higher) product

package. ("Although Team Bonuses may be earned by being an Executive Associate, you can maximize your compensation by being a Pro Associate.") (Ex. 22).

111.    Thus, to receive any commissions with Talk Fusion, an Associate must make at least a one-time purchase of a product package, and continually purchase service packages, if they want to receive commissions under Talk Fusion's plan. If Associates stop purchasing a service package, they will no longer qualify to participate in the compensation plan, and their account will be terminated and closed.

112.    Commissions are paid out using a binary compensation structure, wherein an Associate recruits one associate on the left-hand side and one associate on the right-hand side of their tree. Positions in the team are filled through recruitment directly by a blind associate or indirectly. Talk Fusion tracks the two teams and sales made within the teams. Once 100 Personal Sales Volume is amassed on both sides of the binary legs, a $25 commission is paid out. Each $25 payout is referred to as a "binary cycle." Personal Sales Volume is generated on the sale of product packages, determined by how much the Associate him or herself spends on the products, or was able to sell to customers.

113.    Purchases of product packages by Associates and new recruits generate particular point values, which vary depending on whether the Associate purchased an Executive, Elite, or Professional package. For example, a "Pro" Associate gets

the following point values for product sales by his team of 50 SV for starter; Executive Package-100 SV; Elite Package-300 SV, Pro Package 600 SV.

114. Associates that purchase lower-priced product packages receive less points for the above product sales than the Pro-Associates do for like-kind sales. This is why Associates are told they can earn more by "going pro" when they sign up for Talk Fusion. They are told by buying a higher priced package, they can do the same amount of work and earn more money.

115. Recruits are told, because Talk Fusion's communication products have a monthly subscription, that they can earn a regular and reliable source of income, in the form of residual commissions from service package sales. Like the product package above, each of the service package are assigned a point value. Plan A, which costs $35, provides 20 SV; Plan B, which costs $65, provides 35 SV; Plan C, which costs $115, provides 60 SV; Plan D, which costs $165, provides 85 SV; Plan E, which costs $215, provides 110 SV.

116. As shown above, and in Talk Fusion's Compensation Plan, the SV and binary system of payout is extremely difficult to follow. This is why Talk Fusion emphasizes the power of duplication in its recruiting videos. And new Associates are told to follow 2 in 72, and the 4-Step System.

_____

117.     Blue Diamond Steven Mitchell was able to recruit 80,000 individuals using the 4 Step System, and receive commissions of several million dollars.[53] (Exs. 8-9). His presentation below demonstrates that success with Talk Fusion is based upon Rule of 2 in 72 and recruiting 2 new people who purchase product and service packages, not on sales to retail customers. The statements made below are very similar to others made by other Blue Diamonds at Talk Fusion in recruiting presentations.

> "Finally, there is the real opportunity to own long-term residual commissions on all the monthly subscriptions paid by all the associates and customers in your team. Money coming in week after week, month after month, for years to come. ***True residual income that I like to call the sitting-on the-beach-money.*** Because it could be going into your cash-card account even when your sun-bathing on the beach.
>
> Let's just jump back and explain in a bit more detail, the power of the team commissions and how this one commission alone could generate for you, a life changing income. ***Do you think you might just know two people, who would like to send out some video emails, and would like the opportunity to increase their income?*** Do you think everyone might just know two people like this? ***Well holding that thought of just introducing two people to Talk Fusion, let me show what can happen."[54]***

[54] https://www.youtube.com/watch?v=bPONZGj4cl0



"Firstly, you register as an associate, and start by building two teams: your left team and your right team. This you do by introducing two associates to the Talk Fusion business. One associate is positioned on your left and one on your right. When you have one associate on your left and one on your right, this is called a cycle. Every time a cycle occurs of one associate on the left and one on the right, you're paid a team commission of $25. So just remember, one on your left and one on your right pays you a team commission of $25. Now, once you've introduced two associates yourself, your next task is to help your two new associates introduce their first two new associates, which they also do by starting to build their own left and right teams" "So, in this case, you would have earned two team commissions of $25 each; meaning you would have earned $50 in team commissions*. While that's okay, but hardly a life-changing income I would agree*; hold that thought now with everyone just introducing two people."[55]

---

[55] Id.



"If these two associates each introduced two new associates, you would have four associates on the next level, in both your left and right teams; and if they introduce two, that would be eight on the next level. Continue this down two more levels, and you would then have 16 associates each side on the next level, and 32 on the level below that. Continue this down just a couple more levels, with each person doing no more than just getting two new associates, that means you would have 64 associate on the next level in each team, and a hundred and thirty-two on the level after that. Well let's just stop there for now, and see what that's worth to you. That would be a hundred and thirty-two new associates joining each team this week, and based on the one-and-one cycle, that would mean you would have 132 cycles occurring, which times $25 equals team commissions you would have earned in this week's example of $3300. But even though we have stop there, it's worth remembering that in the real world of Talk Fusion it doesn't stop there: you could be getting paid down 20 levels, 50 levels, a hundred levels. In fact, you are paid-down unlimited levels. Have some fun, and work out what you would be earning, just going down 20 levels, the income potential will make you fall off your chair. ***In fact you can earn up to $50,000 a week in team-***

*commissions with Talk Fusion. Is that big enough lifestyle changing income for you?"*[56]



"I mentioned earlier that you could progress through the promotional ranks to higher and higher income and reward levels. Promotion to higher ranks is primarily based on increasing the amount of cycles that occur in your teams each week. If you generate 10 cycles in a week, you are then promoted to gold associate, and you should expect your earnings to be up around $2000 a month. Generate 50 cycles in a week, and you'll be promoted to 3-star associate, and you would be earning up to $5000 a month. Once you achieve 100 cycles a week, you will now be promoted to Diamond, and you should expect your income to be between $5000 and $10,000 a month. Achieve 150 cycles a week, and you will then be Double-Diamond, and can expect to be earning over $10,000 a month, up to around $15,000 a month. If you are achieving 200 cycles a week, you will be promoted to the Triple Diamond, and enjoying a monthly income from 15 to 20,000 dollars a month. Generate

[56] https://www.youtube.com/watch?v=bPONZGj4cl0

65

250 cycles a week, and you will have reached the penultimate position of Elite Diamond, and your income will between $20,000 to $40,000 a month. Finally, when you achieve 500 cycles in a week, you will have reached the dizzy heights of Blue Diamond, and your income is likely to be in the region of $40,000 the $70,000 a month or more. Plus, you are entitled to a share of the global revenue pool."[57]



**5.      Bonuses ostensibly earned on sales of products and services are, in fact, tied to recruitment of new Associates.**

118.      Talk Fusion expends a great deal of effort to demonstrate how simple it is to earn its bonuses. As shown below, the bonuses are paid out for the recruitment

---

[57] https://www.youtube.com/watch?v=bPONZGj4cl0

of new Associates, and not for sales of products to ultimate users outside the Talk

Fusion Pyramid.



119. **Bronze maker bonus:** The core of talk fusion's compensation plan and

business model is the bronze maker bonus ("the Key to Success with Talk Fusion is

Simple: Achieve the Rank of Bronze, and help others in your Team go Bronze").

Recruits are instructed to recruit 2 new recruits within 72 hours of joining.

Associates are paid $20 instantly when they personally recruit two recruits within

30 days. When these two new recruits recruit two other new recruits, the Associates

are paid an additional $20. The Bronze maker bonus requires recruited associates to

purchase or sell $100 worth of Talk Fusion product packages. There is no limit to

the number of bronze maker bonuses an Associate can obtain. Thus, Associates are incentivized to recruit as many new recruits as possible. (Exs. 21-24).

120. **Fast Start Bonus:** Associates are also lured into the scheme by the "fast start bonus." Depending on which product package is sold purchased by the new recruits, the associate is paid the following amounts for a sale:

> Executive package: $250 – $20
> Elite: $750 – $60
> Pro Package: $1499 – $120

However, (as shown above), because of the prohibitively expensive sign-up cost for the products ($300, 750, $1,499), and Associates' lack of technical knowledge the concerning the products, Associates cannot feasibly sell these products at retail. Instead, they must sell them to new recruits. Thus, the fast start bonus in reality is a bonus for recruitment.

121. **Mega Matching:** Talk Fusion's Mega Matching bonus rewards Associates for recruiting additional Associates and building a team of recruiting Associates. The bonus allows an associate to earn an additional 10% of the team commissions on their personally sponsored associates' commissions. For example, if a sponsor sponsors an associate, John, and John's team has commission of $300, then the sponsoring associate would receive a $30 bonus.

122. **Rank Advancement and Car Bonus**: Talk Fusion's business is based upon recruitment. Thus, rank advancement bonuses are incentivize recruits to recruit

additional Associates. (Ex. 12) Recruits who recruit a certain number of downline associates, which purchase a certain value of Talk Fusion products and services during a 2-week period, qualify for certain bonuses. These bonuses are only paid one time.

Qualified for rank advancement bonuses:
Double Diamond – $2,000
Triple Diamond-a dream getaway trip to Hawaii
Diamond Elite $5,000

Participants reaching the Ambassador level receive a Mercedes Benz car allowance. To qualify for the Mercedes bonus, the representative must attain the rank of 3 stars, and maintain that rank for a two-week period.

123.  **Leadership Pool:** the Leadership Pool bonus is theoretically available to participants achieving the rank of Blue Diamond or higher. However, only 20 Associates have ever reached the rank of Blue Diamond. (Ex. 13).



Neither a participant's eligibility for a leadership bonus nor the amount of the leadership bonus is determined by retail sales.

124.   These rewards are illusory, however, as they exist primarily to benefit the Blue Diamonds, and to lure more victims. Moving up Talk Fusion's ranks is dependent upon bringing in new Associates, who purchase Talk Fusion's overpriced product packages, or pay for the ability to sell Talk Fusion products. Talk Fusion places no emphasis on retail sales to outside customers, and lacks the procedural safeguards to prevent self-consumption to qualify for bonuses.

**6.   In furtherance of its illegal pyramid scheme, Talk Fusion makes false claims about its legitimacy and success.**

125.   In several marketing and promotional videos, Talk Fusion represents that the company operates with the highest ethical standards, and has an A+ rating from the Better Business Bureau; in a May 16, 2015, recruitment video, Cedric Penn made this false representation, when in actuality Talk Fusion has over 33 complaints, and does not in fact have an A+ rating with the Better Business Bureau. (Exs. 25, 26).

126.   In an effort to add legitimacy to Talk Fusion's operations, the Defendants have made several representations that their main competitors are

WebEx, GoToMeeting, and various other conference companies. However, reps of such companies as GoToMeeting have stated they have never heard of Talk Fusion.

127.    In addition, Talk Fusion makes the representation that it was covered by USA Today and Fox News; however, it fails to mention that USA Today article was actually an advertisement, paid for by Talk Fusion.

128.    Finally, despite Talk Fusion's professed policy against making income claims, Talk Fusion employs a custom makes income claims a standard practice on its website, in its magazines, at conventions, and in its advertising.

129.    Moreover, Mr. Mitchell misrepresents income potential within the Talk Fusion opportunity. In his presentation, he puts an income disclaimer on the screen that seems to imply success or failure at Talk Fusion is dependent one's work ethic (Exs 11 and 12).

> "*And if you are thinking, are these big incomes really possible*, I will share some figures with you now, before I do, it is important from ethical standpoint, that I show you this income disclaimer, and read out the following statement: success with Talk Fusion results only from successful sales efforts, which requires hard work, diligence, and leadership. *Your success will depend on how effectively you exercise these qualities*. I mentioned to you earlier on about these bigger incomes that are possible, and for legal and ethical reasons, it wouldn't be appropriate for me now to start putting up actual incomes, people's incomes on the screen. *Recognize the fact that there are individuals right now, who are putting the efforts in, that in a matter of 6 or 7 months are earning anywhere in excess of $15,000 a week right now.* So if your goals and aspirations are the bigger incomes, and *you are prepared with the time and effort into it, uh, clearly, with Talk Fusion the potential is there for you to earn bigger incomes*."[58]

---

[58] https://www.youtube.com/watch?v=bPONZGj4cl0

**7. The arbitration agreement is procedurally and substantively unconscionable and thereby unenforceable.**

130.   According to Talk Fusion, a prospective Associate must agree to Talk Fusion's policies and procedures, terms and conditions, and terms of service before they can become an Associate. Prior to submitting their application, Associates must agree to allow Talk Fusion the unilateral right to "amend the policies and procedures, and the marketing and compensation plan at its "sole discretion at any time." (Ex. 27).

131.   This unilateral right to amend any provision within the Talk Fusion agreement is not the sole reason why the Arbitration Provision is unenforceable. In fact, as detailed below, there are numerous provisions which are substantively and procedurally unconscionable, and thus make the entire arbitration provision void and unenforceable as a matter of law.

In relevant part, the offending provisions are as follows (Ex. 28):

8.1 – Disciplinary Sanctions

"Violation of the Agreement, these Policies and Procedures, violation of any common law duty, including but not limited to any applicable duty of loyalty, any illegal, fraudulent, deceptive or unethical business conduct, or any act or omission by an Associate that, in the sole discretion of the Company may damage its reputation or goodwill, may result, at Talk Fusion's discretion, in one or more of the following corrective measures:

Issuance of a written warning or admonition; Requiring the Associate to take immediate corrective measures; Imposition of a fine, which may be withheld from Bonuses and Commissions; Loss of rights to one or more Bonus or Commission payments;

Talk Fusion may withhold from an Associate all or part of the Associate's Bonuses and Commissions during the period that Talk Fusion is investigating any conduct allegedly in violation of the Agreement. If an Associate's business is canceled for disciplinary reasons, the Associate will not be entitled to recover any Commissions withheld during the investigation period; Suspension of the individual's Associate Agreement for one or more pay periods; Involuntary termination of the offender's Associate Agreement:

Any other measure expressly allowed within any provision of the Agreement or which Talk Fusion deems practicable to implement and appropriate to equitably resolve injuries caused partially or exclusively by the Associate's policy violation or contractual breach; In situations deemed appropriate by

<u>Talk Fusion, the Company may institute legal proceedings for monetary and/or equitable relief.</u>

8.2 – Grievances and Complaints

When an Associate has a grievance or complaint with another Associate regarding any practice or conduct in relationship to their respective Talk Fusion businesses, the complaining Associate should first report the problem to his or her Sponsor who should review the matter and try to resolve it with the other party's upline sponsor. If the matter involves interpretation or violation of Company policy, it must be reported in writing to the Associate Services Department at the Company. The Associate Services Department will review the facts and attempt to resolve it.

8.3 – Arbitration

Any controversy or claim arising out of or relating to the Agreement, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. Associates <u>waive all rights to trial by jury or to any court.</u> All arbitration proceedings shall be held in Hillsborough County, State of Florida. All parties shall be entitled to all discovery rights pursuant to the Federal Rules of Civil Procedure. There shall be one arbitrator, an attorney at law, who shall have expertise in business law transactions with a strong preference being an attorney knowledgeable in the direct selling industry, selected from the panel that the American Arbitration Panel provides. Each party to the arbitration shall be responsible for its own costs and expenses of arbitration, including legal and filing fees. The decision of the arbitrator shall be final and binding on the parties and may, if necessary, be reduced to a judgment in any court of competent jurisdiction. This agreement to arbitration shall survive any termination or expiration of the Agreement.

<u>Nothing in these Policies and Procedures shall prevent Talk Fusion from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction, permanent injunction or other relief available to safeguard and protect Talk Fusion's interest prior to, during or following the filing of any arbitration or other</u>

<u>proceeding</u> or pending the rendition of a decision or award in connection with any arbitration or other proceeding.

8.4 – Governing Law, Jurisdiction and Venue

Jurisdiction and venue of any matter not subject to arbitration shall reside exclusively in Hillsborough County, State of Florida. <u>The Federal Arbitration Act shall govern all matters relating to arbitration. The law of the State of Florida shall govern all other matters relating to or arising from the Agreement.</u> Notwithstanding the foregoing, and the arbitration provision in Section 8.3 residents of the State of Louisiana shall be entitled to bring an action against Talk Fusion in their home forum and pursuant to Louisiana law."

Terms of Service (Ex. 30)

'If an Associate wishes to bring an action against Talk Fusion for any act or omission relating to or arising from the Agreement, such action must be brought within one year from the date of the alleged conduct giving rise to the cause of action. Failure to bring such action within such time shall bar all claims against Talk Fusion for such act or omission. <u>Associate waives all claims that any other statutes of limitations applies."</u>

132.     Furthermore, the arbitration provision contained within Talk Fusion's policies and procedures is one of a contract of adhesion. The provision appears on page 14 of the policies and procedures. These policies and procedures are one of six documents presented as part of the Associate Agreement, via hyperlinks, during the Associate application process. (Exs. 27-30). The arbitration provision appears in the same font as the other provisions in the policies and procedures, as well as a subsection within dispute resolution and disciplinary proceeding section.

133.     Talk Fusion's reservation of a unilateral right to modify the arbitration provision "at its sole discretion at any time" renders the arbitration provision

illusory, and thereby makes it substantively unconscionable. (Ex. 27). Because Talk Fusion can unilaterally modify the arbitration provision at a time of its choosing, and without notice to the Associates and customers of its products, it has no obligation to arbitrate.

134.    Talk Fusion's arbitration provisions subject its Associates, and customers, who do not participate in the compensation plan, but who only purchase the lower priced Executive package, to send video emails to their friends and family, to pay arbitration fees considered prohibitively expensive under AAA's commercial rules. The provision requires an individual to pay location costs for arbitration, and hearing costs that total approximately $12,000 for a three-day trial. Because of this, Plaintiff would have to travel over 4,000 miles to vindicate his rights, hire counsel, and pay for hotel and airfare. These excessive hearing fees work to preclude Talk Fusion's few legitimate consumers, including those who do not want to participate in the compensation plan, and its Associates, from vindicating their California statutory rights.

135.    Moreover, it is unclear from the text of the arbitration provision, who decides the issue of delegation, as to which issues are arbitral and which are not. In essence, a consumer who purchased a Talk Fusion Pro package for $1,499, and paid an additional $420 in monthly fees (total $1,999), would have to pay an additional $12,000 to travel to Florida. Upon arriving in Florida, the consumer would then have

to file an arbitration petition to determine if an arbitrator or a judge should decide the issue, and whether the legal claim is subject to arbitration.

136.    In addition, the scope of the arbitration provision is unclear as to what claims are subject to arbitration. The provision states that "any controversy or claim arising out of or relating to the agreement" is subject to arbitration. However, the provision is limited merely to claims or controversies relating to or arising from the agreement. Claims and Controversy are not defined, nor are examples of such Claims or Controversy provided in the provision.  Instead of a very broad provision that uses the language "whatsoever," Talk Fusion limits the claims to those "relating or arising from the agreement." It is also not clear from the face of the provision, as to whether the provision is limited to the rights and duties under the agreement, or if it is broad enough to cover the validity of the provision itself.

137.    Further compounding this issue, there is not an express and unmistakable delegation of this issue to the arbitrator; this is unlike many standard arbitration provisions. As Talk Fusion pointed out, in its *Reply to its Motion to Dismiss or/alternative Motion to Transfer*, the forum selection clause must be read in conjunction with the arbitration clause. And as Talk Fusions pointed out, there are claims that are too remote to be included within the scope of the arbitration provision, "possibly such as personal injury claims," which would no doubt be excluded from the arbitration provision." In sum, certain claims are subject to

arbitration, while others are not. Thus, there is no clear express and unmistakable delegation provision as to who should decide the issue of what claims are subject of the arbitrator or a court.

138.    Because it requires an Associate or customer to pay their own attorney's fees and costs, the provision further deters Associates and customers, (including consumers who do not participate in Talk Fusion's compensation plan), from seeking redress for harm caused by Talk Fusion's unfair and unlawful business practices.

139.    A few of these Associates and consumers may have purchased the Talk Fusion products and services for personal use or consumption. Because of the prohibitively expensive administrative fees of Commercial Arbitration, these Associates and Consumers are denied a forum for their grievances.

140.    As such, these Associates and consumers have taken to filing claims with Florida's Better Business Bureau, which often does not provide the Associate or customer with a resolution to the matter. (Ex. 26).

141.    In total, over 33 claims have been filed with Florida's Better Business Bureau, relating to Talk Fusion's business practices. (Id.) In particular, many consumers are having an issue with Talk Fusion's 3-day-refund policy. Many consumers are duped into "going Pro," and buying the $1,499 package of videoconferencing technology that they know little about and will receive little

guidance on. If the consumer does not cancel within 3 days of the date of purchase, Talk Fusion does not refund the customer their purchase price. Many Consumers and Associates have brought to Talk Fusion's attention that the three-day return policy violates numerous states' refund and cancellation laws, and the law in Russia, where Talk Fusion does a lot of business. However, Talk Fusion, in many instances, refuses to refund the consumer's or Associate's money. Several Associate and consumer complaints and Talk Fusion responses taken from the Florida's Better Business Bureau website are attached as exhibit twenty-six, and incorporated herein.

142.     The arbitration provision also requires that Associates ***waive their right to a jury trial*** and access to the courts, but expressly reserves the right for Talk Fusion to apply "to and obtain from any Court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction, permanent injunction or other relief available to safeguard and protect Talk Fusion's interest prior to, during or following the filing of ***any arbitration or other proceeding*** or pending the rendition of a decision or award in connection with any arbitration or other proceeding." (Ex. 28).

143.     In addition, under Provision 8.1 of its Policies and Procedures, (above the arbitration provision), Talk Fusion expressly reserves the right, in: ***"situations deemed appropriate by Talk Fusion," "the Company may institute legal proceedings for monetary and or equitable relief."*** (Id.)

144.     In fact, Talk Fusion has expressly exercised its right to file legal actions against Associates. For example, Talk Fusion filed the action *Talk Fusion v. Ulrich* for injunctive relief, breach of contract, purchase interference with a contractual relationship, purchase interference in advantageous business relationship, misappropriation of trade secrets, unfair competition, conversion, conspiracy, purchase interference, and contractual relationship in the United States District Court, middle District of Florida Tampa Division. Case number 8:1111 – CV – 01134 – v. MC – AEP. (Ex. 31).

145.     Moreover, Provision 8.1 allows Talk Fusion to implement legal proceedings for monetary or equitable relief, in any Court having jurisdiction over the matter, and in any venue of Talk Fusion's choosing.

146.     Under California law, a jury trial is a matter of right, and is void as a matter of public policy. In Talk Fusion's arbitration provision, Associates are not given meaningful notice of the jury waiver provision. The waiver provision appears in the same font as the arbitration provision, and is limited to a few quick words. Further, the jury waiver provision does not appear in the governing law, jurisdiction, or venue provision, which addresses claims not subject to the arbitration provision. Because Associates are not given meaningful notice of the jury waiver, an Associate or customer of Talk Fusion cannot be said to have "knowingly and voluntarily waived their right to a jury trial." _____

147.     In essence, Talk Fusion may have access to any and all courts in the United States to seek any remedy, either at law or in equity, before a jury or a judge; however, Associates and customer of Talk Fusion are precluded from receiving the same right; this further demonstrates the lack of mutuality in the arbitration provision.

148.     Moreover, the terms and conditions incorporated into the arbitration provision, limit the right of an Associate to bring an action against Talk Fusion "for an act or omission relating to or arising from the agreement <u>to within one year from the date of the alleged conduct giving rise to the cause of action</u>. Failure to bring such an action within such time shall bar all claims against Talk Fusion for such act or omission." In addition, Associates must waive all claims that any other statute of limitation applies. This provision does not apply to Talk Fusion, and would allow Talk Fusion to wait for the one-year-statute of limitations on a claim to expire, and initiate an arbitration, or action in any court, and seek the benefit of California's four-year statute of limitations, with respect to the act or omission relating to a California citizen.

149.     Furthermore, Talk Fusion's arbitration provision limits the venue to Hillsboro County, Florida, for any claim outside of the to arbitration provision, and requires the application of Florida law. (Ex. 28). The governing law section, <u>however, is equally as confusing as the arbitration provision, as it states the FAA</u>

(Federal Arbitration Act) governs all matters relating to the arbitration, but fails to specify the applicable law. The choice of law provision, which comes directly after the statement about the law governing the arbitration provision, states the law of the State of Florida shall govern "**all other matters** relating to or arising from the agreement." As the arbitration provision is a section in the agreement, it is unclear as to what specific law applies to the issue of the validity of the arbitration provision contained within the agreement, because Florida law is expressly excluded from this analysis, based upon the plain meaning of the governing law provision.

150.    The purpose of these provisions as they apply to California citizens is clear, though. They are an attempt to shield Talk Fusion from liability under California law, in violation of *California Civil Code 1667*, by making it too expensive for California citizens to arbitrate, requiring them to waive a fundamental right to a jury trial in violation of California public policy, limiting the available statutorily mandated four-year statute of limitations for Plaintiffs' UCL and FAL claims, precluding the right to injunctive relief under the UCL and FAL, precluding the right to attorneys' fees recoverable under RICO, and limiting the right to recover punitive damages under RICO. In sum, Talk Fusion attempts to strip California Statutory rights from its residents, while expressly reserving all rights and remedies under California law for itself.

_____

151.    Because Talk Fusion's arbitration provision is unconscionable, the claims of Plaintiff and the Classes are not subject to arbitration, and this action is properly before the Court. Talk Fusion cannot come to California and solicit clients for its illegal pyramid scheme, and evade redress for its violations of California law by seeking to invoke this patently unconscionable and unenforceable arbitration provision.

### 8. Under the factors considered by the Ninth Circuit in BurnLounge, Talk Fusion is a pyramid scheme.

152.    Under BurnLounge, the Ninth Circuit focuses on several factors in determining whether BurnLounge was a pyramid scheme. They are as follows: 1) purchasing patterns, 2) lack of value, 3) requirements for a participant to buy products to increase the earnings potential, 4) lack of consumer safeguards, and 5) an emphasis on marketing.

153.    Talk Fusion attempts to skirt the first BurnLounge factor, dealing with the purchasing pattern of its Associates, by stating in its policies and procedures that it does not keep track of the income earnings of associates, and thus cannot provide income disclosures to new Associates. It does, however, reveal, the majority of Talk Fusion Associates do not earn any money by marketing and selling Talk Fusion's products and services to customers. As shown above, Talk Fusion's associates are forced to purchase $300, $750, and $1499 products, and maintain monthly service fees of $35 to $215, so that they can stay "Active" and "Qualified" to participate in

Talk Fusion's compensation program. Thus, the purchase pattern of the distributors will show that Associates purchased premium products, like the Pro Package, at the behest of Blue Diamond co-conspirators. Because these co-conspirators encouraged Associates to buy in order to qualify for compensation, Associates' actions do not constitute retail sales.

154.    As alleged above, the products and services marketed by Talk Fusion have limited value, and thus the primary motivation behind such purchases by Associates was not legitimate product consumption. Instead, Associates were motivated by the desire to increase their earnings potential. (Furthermore, video emails are available for free from many companies.) In addition, services provided by Talk Fusion's alleged patent pending software, Connect, which is sold in the $750 and $1499 Executive and Pro packages, are widely available for free. As such, the Associates' purchases of these products is motivated by the potential to increase his or her earnings potential, as opposed to actual and legitimate market demand.

155.    New Associates are told to go Pro and go Pro early, to increase their chances of making Diamond and their income potential. As shown above, to qualify for commissions, Talk Fusion Associates at a minimum are required to purchase a $250 starter package, or a $750 executive package, and to pay $35 a month storage fee to stay Active and Qualified, for bonuses and commissions. In addition, Associates have to recruit several additional participants to qualify for basic bonuses,

or going Bronze bonuses. As such, Talk Fusion's plan forces Associates to focus on recruitment and buying items—items that an Associate would have never bought, but for the income opportunity doing so offered.

156.    In addition, it is clear there is a lack of consumer safeguards within Talk Fusion's organization. Talk Fusion wants Associates to self-consume their products and not attempt to sell them to retail. Once purchased, the product packages are subject to a three-day refund policy. Under Talk Fusion's compensation plan, very few safeguards exist to prevent Associates from purchasing unnecessary packages, upgrading packages, and continuing to maintain monthly storage fees.

157.    Finally, and as demonstrated above, it is clear that Talk Fusion Associates focus primarily on recruitment of new Associates over product sales to ultimate users outside the business. The 4-Step duplication system and the Diamond Rush marketing program clearly shows that Talk Fusion's emphasis was on quick recruitment, as opposed to the sale of viable products to consumers. In fact, Hall of Fame Blue Diamond Cedric Penn is quoted as saying that Associates "should not talk about products," as they will not succeed at Talk Fusion in doing so. They should instead talk about wealth. This emphasis on wealth creation in marketing programs allowed Steve Mitchell to acquire 80,000 downline members in a short period of time. Moreover, as Defendant Reina's Flower Shop Example demonstrates, it

_____

doesn't matter whether Talk Fusion is selling "flowers" or "videoconferencing software," as long as the potential for wealth and leverage is present.

158.    In sum, like BurnLounge, FHTM, and the recent VEMMA action by the FTC, Talk Fusion's business model is primarily driven by recruitment of new Associates as opposed to actual sales of products to retail consumers. Like FHTM, which sold memberships with monthly fees, commissions were paid on these fees, and third party products had very small retail margins and affiliates earned money primarily from membership fees of recruited affiliates. Talk Fusion's business model is executed in a similar manner, merely switch out selling memberships, with video conferencing products, or flowers for that matter, and you have Talk Fusion. Talk Fusion's video products are merely incidental to the scheme. While the court is currently looking at how VEMMA handled recruitment in the form of joining packages and monthly auto ship requirements with commissions paid on these purchases, it will likely find this practice violates the law.

159.    As shown above in this complaint, it is clear that Talk Fusion is operating a pyramid scheme like those found to be unlawful in Burnlounge and FHTM. And thus, all that is necessary is that the court certify a class action, and award plaintiff's damages for the harm they incurred as a result of Defendants' fraudulent and unlawful business practices.

## V.    PLAINTIFFS' CLASS ACTION ALLEGATIONS

160.     Each plaintiff was induced to pay money to Talk Fusion by numerous misrepresentations, including false claims that Talk Fusion is a legitimate network-marketing company and not an illegal pyramid scheme. As the direct and proximate result of such misrepresentations, each plaintiff was damaged.

161.     This action is brought by Plaintiff as a class action pursuant to Federal Rule of Civil Procedure 23.

162.     Plaintiff seeks relief on behalf of themselves and a nationwide class of all persons who were Associates from September 1, 2011, until the present, and who were injured as a result of Defendants' illegal pyramid scheme (the "Class"). Excluded from the class are the Defendants, their employees, family members, and affiliates.

163.     Plaintiff also seeks relief on behalf of themselves and a subclass for the California-State law claims, which includes all persons who are members of the class and who were or are Associates and residents of California (the "subclass").

164.     The members of the class and the subclass number in the thousands and joinder of all Class members in a single action is impracticable.

165.     There are questions of law and/or fact common to the class and subclass, including but not limited to:

a.     Whether Defendants were operating an unlawful pyramid scheme;

b.      Whether Associates paid money to Defendants in exchange for (1) the right to sell a product and (2) the right to receive, in return for recruiting others in to the program, rewards which were unrelated to the sale of the product to retail consumers;

c.      Whether Associates were required to make an investment into the pyramid scheme;

d.      Whether Defendants conduct constitutes an "Endless Chain" under the California Penal Code;

e.      Whether Defendants omitted to inform Plaintiff and the plaintiff class that they were entering into an illegal pyramid scheme where the overwhelming majority of Associates lose money;

f.      Whether Defendants engaged in acts of mail and/or wire fraud in direct violation of RICO;

g.      Whether and to what extent the conduct has caused injury to Plaintiff and the Plaintiff class;

h.      Whether Defendants' conduct constitutes an unlawful, unfair and fraudulent business practice under the California Business and Professions Code; and whether Defendant's conduct constitutes false advertising under the California Business and Professions Code.

_____

166.     These and other questions of law and/or fact are common to the class and the subclass, and predominate over any question affecting only individual class members.

167.     Plaintiff's claims are typical of the claims of the class and the subclass in that Plaintiffs were Associates for Talk Fusion and lost money as a result of the pyramid scheme.

168.     Plaintiff will fairly and adequately represent the interests of the class and the subclass in that plaintiffs' claims are typical of those of the class and Plaintiffs' interests are fully aligned with those of the class. Plaintiff has retained counsel who is experienced and skilled in complex class-action litigation.

169.     Class-action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein, because such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.

170.     Plaintiff knows of no difficulty likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## VI. CLAIMS FOR RELIEF

## COUNT I

## JUDGMENT DECLARING FORTUNE'S ARBITRATION AGREEMENT UNCONSCIONABLE

171.     Plaintiff re-alleges the foregoing paragraphs as though fully set forth herein.

172.     Plaintiff and the class do not claim the Talk Fusion Associates Agreement is unconscionable, but do claim the arbitration provision contained within the Associates Agreement is procedurally and substantively unconscionable

173.     Talk Fusion's Associate Agreement, and its incorporation of the Policies and Procedures, contains an arbitration provision.

174.     Talk Fusion's arbitration provision was presented to plaintiffs and the plaintiff class on a "take it or leave it basis." Plaintiff and the plaintiff class were not given any opportunity to negotiate the terms of the arbitration provision. As such, the arbitration provision is procedurally unconscionable. The talk fusion arbitration agreement arbitrary allows talk fusion to unilaterally resort to the judicial process, while the associate cannot. This lack of mutuality is unconscionable and unfair.

175.     Talk Fusion's arbitration provision is permeated with substantively unconscionable terms examples of which, while not exhaustive, are as follows:

176.     Talk Fusion's provision incorporates the Associate Agreements and its accompany documents. Talk Fusion's Policies and Procedures grant Talk Fusion the power to unilaterally modify the terms of the arbitration provision at any time, thereby rendering the arbitration provision illusory. Talk Fusion's unilateral right to

177.    modify the arbitration provision renders the arbitration agreement substantively unconscionable.

178.    Talk Fusion's Policies and Procedures provide an inherently biased arbitrator and arbitrator-selection process. Forcing Associates to arbitrate in an inherently biased arbitral forum renders the arbitration provision substantively unconscionable.

179.    Talk Fusion's Policies and Procedures require arbitration to take place in the AAA arbitral forum. The AAA. arbitral forum requires an individual Rep to pay costs that total $18,000.00 for a three-day trial. Most Associates and class members, who have each already lost thousands of dollars during their involvement with the Defendants, do not have the financial means to pay these excessive hearing fees. Accordingly, these prohibitively expensive arbitration costs preclude Associates from vindicating their rights and render Talk Fusion's arbitration provision substantively unconscionable.

180.    Talk Fusion's arbitration provision prevents an Associates from bringing a class action in arbitration. Accordingly, Talk Fusion's class action prohibition renders the arbitration provision substantively unconscionable.

181.    The Talk Fusion arbitration agreement also requires that Associates waive their right to a jury trial and access to the courts. However, it reserves the right for Talk Fusion to apply to any Court having jurisdiction for a writ of attachment, a

temporary injunction, or any other relief available to Talk Fusion to protect its interests prior to, during, or filing of any arbitration or other proceeding or pending the rendition of a decision or award in connection with any arbitration or proceeding. In essence, Talk Fusion may have access to the Courts to seek a remedy; however, Associates are precluded from receiving the same right; further demonstrating a lack of mutuality in the agreement. This biased pre-arbitration requirement is intended to deter Associates from vindicating their rights. Accordingly, Talk Fusion's pre-arbitration conciliation process is substantively unconscionable.

182.    Accordingly, the Court should declare that Talk Fusion's arbitration provision is procedurally and substantively unconscionable and that the plaintiff claims are properly before this Court.

## COUNT II

## RACKETEERING ACTIVITY IN VIOLATION OF 18 U.S.C. 1962(C) (VERSUS ALL DEFENDANTS)

183.    Plaintiffs re-allege each of the preceding paragraphs as if fully set forth here.

184.    Each defendant is a "person" for purposes of RICO, 18 U. S.C. § 1962, because each defendant is, and was at all relevant times, an individual or entity capable of holding legal or beneficial interest in property.

185.    All of the Defendants in this action collectively form an "enterprise" under R1CO, 18 U.S.C. § 1962, in that they are a group of individuals and entities associated in fact, although not a legal entity.

186.    In the alternative, the enterprise consisted of Talk Fusion, which is controlled by Defendant Robert Reina, and un-named Blue Diamond co-conspirators such as Cedrick Penn, Ron Wright, and Steven Mitchell.

187.    In the alternative, the Talk Fusion Pyramid is an enterprise, in that it is an association in fact of all Defendants and others which, although not gathered under any legal entity, operates the illegal pyramid scheme to draw new investors to Talk Fusion.

188.    The Defendants engaged in a pattern of racketeering activity by participating in a scheme and artifice to defraud, in violation of the mail and wire fraud statutes: 18 U.S.C. §§ 1341 and 1343.

189.    The Defendants' promotion of an illegal pyramid scheme is a per se scheme to defraud under the mail and wire fraud statutes; thus, the Defendants have committed racketeering acts by promoting an illegal pyramid scheme by using and causing others to use the mail and by transmitting and causing others to transmit, by means of wire in interstate commerce, writing, signs, signals, pictures and sounds, all in furtherance of and for purposes of executing a scheme or artifice to defraud, namely an illegal pyramid scheme.

190.     Each Defendant has promoted the Talk Fusion Pyramid. Each use of the mail or wire by the Defendants in furtherance of the Talk Fusion Pyramid is therefore an act of racketeering.

191.     Moreover, the Defendants have used false and fraudulent pretenses to deceive the plaintiffs and the Class, and to thereby obtain money and property from the same. The Defendants have engaged in materially misleading statements of facts and nondisclosure of particular facts, including:

A. Creating the false impression that the majority of investors in the Talk Fusion Pyramid will profit from their investment by merely working hard.

B. Creating the false impression that Talk Fusion has a unique business model that is unusually generous to investors.

C. Creating the false impression that articles, such as the USA Today article, used to induce investments in the Talk Fusion Pyramid were articles written by objective third-parties, when in reality they were paid advertisements.

D. Failing to clearly disclose that the purported success and wealth achieved by the individual Defendants through their participation in the Talk Fusion Pyramid is no longer possible, and not due to a failure.

192.   These and other misrepresentations at the heart of the Defendants' enterprise were reasonably calculated to deceive a person of ordinary prudence and comprehension.

193.   Plaintiffs and the class relied on these misrepresentations.

194.   All of the Defendants acted with intent to defraud.

195.   The Defendants' numerous acts of mail fraud and wire fraud amount to a pattern of racketeering activity because they are related and continuous. The pattern consists of more than two acts, which occurred from 2007 until present, and consistently throughout that period. The predicate acts of mail and wire fraud are related because they have had the same or similar purpose: to convince new investors to pay to join the Talk Fusion Pyramid by paying money to do so, and to convince those investors to in turn recruit new investors. They have the same result: convincing investors to join the Talk Fusion Pyramid by paying money and having those investors recruit new ones to do the same. They have the same Associates: Talk Fusion's executives and Blue Diamond Co-Conspirators; all of whom promote the Talk Fusion Pyramid. They have the same victims: plaintiffs and class members who were fraudulently deceived into investing in the Talk Fusion Pyramid. Finally, they have similar methods of commission: fraudulent misrepresentations concerning numerous aspects of Talk Fusion's operations made via online presentations, in-person gatherings, and written materials. In short, the predicate acts of wire and mail

fraud committed by the Defendants constitute an intricately related set of predicate acts sufficient to meet the relatedness standard.

196.   Moreover, the predicate acts are continuous. They pose a threat of continued illegal conduct in that the Defendants continue to promote and operate the Talk Fusion Pyramid and have expressed their intention to continue to do so. Additionally, the predicate acts have extended over a significant period of time — the nearly 8 years that Talk Fusion has been in existence. The Defendants' regular business of attracting new Associates is conducted by ongoing mail and wire fraud that misrepresents that Talk Fusion is a legitimate multilevel marketing enterprise and not an illegal pyramid scheme. Without the repeated acts of wire and mail fraud, the Defendants' fraudulent pyramid scheme would not be in existence.

197.   As a direct and proximate result of the Defendants' acts of mail and wire fraud, plaintiffs and the class were injured in their business and property. Each plaintiff was injured in his or her business or property by reason of the Defendants' pattern of racketeering activity, in that plaintiffs surrendered valuable consideration of at least $250, and in most cases much more, in order to participate in the inherently fraudulent scheme promoted by the Defendants.

198.   Each enterprise alleged above was engaged in, or affecting, interstate commerce by reason of, at least, each of the Defendants' numerous acts or omissions constituting use of the mail or interstate wire communication facilities in furtherance

of their scheme to defraud. Additionally, each enterprise affected interstate commerce because the members comprising it engaged in business in several states and made use of the mail and interstate wire communication facilities in the process of doing so by causing marketing and promotional materials for Talk Fusion, as well as images, videos, and information to be communicated through regular mail and via the Internet.

199. Each of the Defendants is employed by or associated with each enterprise above to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, i.e., conducting the affairs of, promoting, and otherwise supporting the pyramid scheme.

200. Specifically, Robert Reina. Talk Fusion, Inc., Talk Fusion, International, Inc., and Mane World Productions, Inc. were involved in the creation and dissemination of marketing materials containing misrepresentations regarding Talk Fusion and have authorized the Blue Diamond Co-Conspirators to direct conference calls, websites, web presentations and speeches that contain numerous misrepresentations and that deceive people into participating in the Talk Fusion Pyramid.

201. Pursuant to 19 U.S.C. § 1964, Plaintiffs are entitled to recover treble damages, costs, and attorneys' fees.

## COUNT III

**RACKETEERING ACTIVITY IN VIOLATION OF 18 U.S.C. 1962(A)**
**(VERSUS ALL DEFENDANTS)**

202.   Plaintiffs re-allege each of the preceding paragraphs as if fully set forth here.

203.   Revenue derived from the pattern of racketeering activity set forth above, which upon information and belief constitutes a significant portion of the Defendants' total income, was reinvested into the Talk Fusion Pyramid for at least the following purposes: (1) to expand the operations of the Talk Fusion Pyramid through additional false and misleading advertising and promotional materials aimed at recruiting new Associates in the Talk Fusion Pyramid; (2) to facilitate the execution of the Talk Fusion Pyramid; and (3) to convince existing Associates in the Talk Fusion Pyramid to recruit new ones, resulting in harm to plaintiffs and the class.

204.   Plaintiffs and the class were injured in their business or property as a result of such reinvestment into the Talk Fusion Pyramid because they were induced, with funds used to establish new levels of the Talk Fusion Pyramid, to invest in Talk Fusion

205.   Pursuant to 19 U.S.C. § 1964, plaintiffs and the class are entitled to recover treble damages, costs, and attorneys' fees.

1

## COUNT IV

2

## CONSPIRACY TO COMMIT RACKETEERING ACTIVITY IN VIOLATION OF
## 18 U.S.C. & 1962(D)
## (AGAINST ALL DEFENDANTS)

3

4

206.   Plaintiffs re-allege each of the preceding paragraphs as if fully set forth here.

5

6

207.   The Defendants conspired to violate 18 U.S.C. § 1962(a) and (c) in violation of 18 U.S.C. § 1962(d).

7

8

208.   Each defendant knew about and knowingly and intentionally agreed to participate in and promote an illegal pyramid scheme. Specifically, the Defendants had a meeting of the minds on an object and course of action, namely, to create, support, and maintain the pyramid scheme for their own financial benefit.

9

10

11

12

209.   Each of the Defendants has committed multiple overt acts in furtherance of the unlawful objects of the pyramid scheme.

13

14

210.   The plaintiffs and the class were injured in their business or property as a result.

15

16

211.   Pursuant to 19 U.S.C. § 1964, plaintiffs and the class are entitled to recover treble damages, costs, and attorneys' fees.

17

18

19

20

_____

**COUNT V**
**INJUNCTIVE RELIEF UNDER 18 U.S.C. & 1964(A)**
**(AGAINST ALL DEFENDANTS)**

212.   Plaintiffs re-allege each of the preceding paragraphs as if fully set forth here.

213.   To prevent and restrain ongoing violations of 18 U. S.C. § 1962 by the Defendants, the court should order the Defendants to divest themselves of any interest, direct or indirect, in the enterprise; impose reasonable restrictions on the future activities or investments of the enterprise, including, but not limited to: prohibit the Defendants from engaging in the same type of endeavor as the enterprise engaged in, or order dissolution or reorganization of the enterprise.

**COUNT VI**

**UNLAWFUL, UNFAIR AND FRAUDULENT BUSINESS PRACTICES**
**UNDER THE CALIFORNIA BUSINESS AND PROFESSIONS CODE §**
**17200, ET SEQ.**
**(AGAINST ALL DEFENDANTS)**

214.   Plaintiff and the subclass re-allege the foregoing paragraphs as though fully set forth herein.

215.   Defendants are engaged in an illegal pyramid scheme or "endless chain" as defined under California Penal Code § 327. Defendants utilize this illegal pyramid scheme with the intent, directly or indirectly, to dispose of property in the form of Talk Fusion products and "tools and function materials," and to convince Associates to recruit others to do the same.

216. Defendants' business acts, false advertisements, and materially misleading omissions alleged herein constitute unfair trade practices and false advertising in violation of the California Business and Professions Code § 17500, et seq.

217. Defendants engaged in false, unfair, and misleading business practices consisting of false advertising and materially misleading omissions that were likely to deceive the public and include, but are not limited to:

A. Defendants' failing to disclose to consumers that they were entering into an unlawful pyramid scheme.

B. Defendants' misrepresenting the amount of money that a Rep would earn; Defendants' misrepresenting those Associates would not need to engage in retail sales to make money and instead would earn the promised revenue by simply self-consuming products and convincing others to do the same.

218. Defendants' marketing and promotion of the illegal pyramid scheme constitutes misleading, unfair and fraudulent advertising in connection with their false advertising to induce consumers to join the illegal pyramid scheme. Defendants knew or should have known, in the exercise of reasonable care that the statements they were making were untrue or misleading and did deceive members of the public. Defendants knew or should have known, in the exercise of reasonable care, those

California citizens, including Plaintiff, would rely, and did in fact rely on Defendants' misrepresentations and omissions.

219. Defendants should be ordered to disgorge, for the benefit of Plaintiff and the Plaintiff Class, their Talk Fusion profits and compensation and/or make restitution to the Plaintiff and the Class.

## COUNT VII

## CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17500, ET SEQ. (AGAINST ALL DEFENDANTS)

220. The Plaintiffs and the subclass re-allege the foregoing paragraphs as though fully set forth herein.

221. Defendants' business acts, false advertisements, and materially misleading omissions alleged herein constitute unfair trade practices and false advertising, in violation of the California Business and Professions Code §17500, et seq.

222. Defendants engaged in false, unfair, and misleading business practices consisting of false advertising and materially misleading omissions that were likely to deceive the public and include, but are not limited to:

   a.   Defendants failing to disclose to consumers that they were entering into an unlawful pyramid scheme;

   b.   Defendants misrepresenting the amount of money that a distributor

would earn;

c.    Defendants misrepresenting that distributors would not need to engage in retail sales to make money and instead would earn the promised revenue by simply self-consuming products and convincing others to do the same.

223.    Defendants marketing and promotion of the illegal pyramid scheme constitutes misleading, unfair, and fraudulent advertising in connection with their false advertising to induce consumers to join the illegal pyramid scheme. Defendants knew or should have known in the exercise of reasonable care that the statements they were making were untrue or misleading and did deceive members of the public. Defendants knew or should have known, in the exercise of reasonable care, that California citizens, including Plaintiffs, would rely, and did in fact rely on Defendants' misrepresentations and omissions.

224.    Defendants should be ordered to disgorge, for the benefit of the plaintiffs and the plaintiff class, their Talk Fusion profits and compensation and/or make restitution to the plaintiff and the class.

## VII. PRAYER FOR RELIEF

225.    The named plaintiffs and the plaintiff class request the following relief:

A.    Judgment declaring Talk Fusion's arbitration provision unconscionable and unenforceable;

B. Certification of the class;

C. Jury trial and judgment against the Defendants;

D. Damages in the amount of the named plaintiffs' and the class's financial loss as a result of Defendants' conduct and for injury to plaintiffs' and the class's business and property, all as a result of Defendants' violations of 18 U.S.C. § 1962(a),(c), and (d) and that such amount be tripled in accordance with 18 U.S.C. § 1964(c);

E. Temporary and permanent injunctive relief enjoining the Defendants from further unlawful, unfair, fraudulent, or deceptive acts, including but not limited to: operating and supporting the Talk Fusion Pyramid.

F. Restitution and disgorgement of monies, pursuant to the California Business and Professions Code;

G. The cost and expense of suit, including reasonable attorneys' fees, in accordance with 18 U.S.C. § 1964(c);

H. For general, compensatory, and exemplary damages in an amount yet to be ascertained; and

I.  For such other damages, relief, and pre- and post-judgment interest that the Court may deem just and proper.

_____

## VIII.  DEMAND FOR A JURY TRIAL

Plaintiffs hereby demand a jury trial as provided by Rule 38 of the Federal Rules of Civil Procedure.


Date: November 26, 2015                    Respectfully submitted,

                                           */s/ Geoffrey J. Spreter*
                                           **SPRETER LAW FIRM, APC**
                                           402 W. Broadway, Suite 860
                                           San Diego, CA 92101
                                           Tel: (619) 865-7986/Fax: (619) 342-9600
                                           *Geoff@spreterlaw.com*